[No. 32349-1-I.   Division One.   July 3, 1995.]
*In re the Marriage of* REBECCA ANN SIEVERS, *Respondent, and* A. JOEL EISENBERG, *Appellant.*

*C. James Frush* and *Karen Vanderlaan*, for appellant.

*Deborah Elvins* and *Cynthia Whitaker*, for respondent.

KENNEDY, A.C.J. — Following the dissolution of his marriage to Rebecca Sievers, Joel Eisenberg appeals (1) the trial court's interpretation of the income tax liability clause contained in the parties' property settlement agree-

ment, (2) the trial court's award to Sievers of $3,000 per month per child for the support of the parties' three children and the requirement that Eisenberg secure the child support with decreasing term life insurance, and (3) the trial court's award to Sievers of $210,000 for attorney fees based in substantial part on findings that Eisenberg breached his fiduciary obligations and duties of good faith and fair dealing in promoting an interpretation of the tax liability clause which was inconsistent with the parties' actual settlement intent. In her cross-appeal, Rebecca Sievers argues that the trial court erred in determining that it had no authority to impose an equitable lien upon real estate conveyed to Eisenberg to secure his obligation to pay the bulk of the parties' federal income tax liability, in that the parties had not provided for such a lien in their property settlement agreement. We affirm the trial court's interpretation of the property settlement agreement, its child support award and its attorney fee award. We remand for preparation and entry of child support worksheets. We reverse the trial court's determination that it lacked authority to impose an equitable lien under the circumstances of this case, and remand so that the trial court may exercise its discretion in determining whether to impose a lien to secure Eisenberg's performance of his tax obligations in accord with the terms of the property settlement agreement and the decree of the court. We award Sievers a reasonable attorney fee for defending against Eisenberg's appeal. Each party will bear his and her own attorney fees for the cross-appeal.

## FACTS

Because Eisenberg challenges the sufficiency of the evidence to support various of the trial court's findings of fact, we outline the evidence in considerable detail.

## Tax Issues

Eisenberg and Sievers were married in 1981. The petition for dissolution of marriage was filed on April 30, 1990. The parties separated on May 9, 1990.

At the outset of the marriage, Eisenberg had virtually no assets. He was unable to obtain credit on reasonable terms, due to a previous bankruptcy. Sievers did not have substantial assets, but she did have access to credit.

During the marriage, Eisenberg created and managed a group of 85 or more businesses referred to collectively as "Megaquest". These businesses, which provided "adult" and other entertainment and informational services by telephone through 900 and 976 numbers, were financially interrelated and operated in some 30 states and various foreign countries. The businesses were organized as Subchapter S corporations and partnerships. Although Sievers served as a full-time homemaker during the marriage, and took no active role in the businesses, she was named as the shareholder/partner in the businesses, along with Eisenberg's business partner Betsy Superfon. Sievers received an annual income designated as a salary and knew that the businesses generated a lot of income, but Eisenberg was in charge of the financial affairs of the businesses and Sievers had no understanding of the tax treatment of income generated by the Subchapter S corporations and partnerships held in her name. Eisenberg did understand these tax matters.

The businesses generated many millions of dollars in annual income. By the time of separation, Eisenberg and Sievers had accumulated more than $10 million in assets, exclusive of the value of the businesses. Eisenberg's business partner, Betsy Superfon, was not pleased at the prospect of a lengthy and disruptive divorce proceeding. Sievers and Eisenberg also wished to speedily resolve their financial issues arising from the pending dissolution of marriage.

Sievers and Eisenberg each retained lawyers. Shortly after separation, settlement negotiations began.

Against the advice of her counsel, Sievers did not wish to go to the time, trouble, and expense of having the businesses professionally appraised. She did not wish to be involved, nominally or otherwise, in the businesses. Eisen-

berg represented to Sievers that, due to changes in the law and various other adverse factors, the good times were over for Megaquest and business prospects were poor. Megaquest also had substantial contingent liabilities. Sievers decided to settle for approximately half of the nonbusiness assets, some $5.5 million worth of readily valued assets, many of a liquid nature, leaving some $5 million in nonbusiness assets for Eisenberg plus all of the parties' Megaquest interests, subject to all of Megaquest's liabilities, known and unknown. This settlement was reached on July 5, 1990, during a settlement session attended by the parties and their attorneys. Included in Sievers' settlement package was $2.5 million in cash to be paid to her by Eisenberg in exchange for her interest in the couple's new family home, then under construction.

Late in the evening of July 5, Eisenberg's attorney reduced the parties' settlement to a memorandum form, which the parties now refer to as the "July property settlement agreement" (hereinafter, July PSA), and which the parties' and their attorneys signed. The first page of the July PSA is handwritten.[1] Paragraph 6 reads as follows:

> 6. Indemnification Re: Business Liabilities. ~~Tax~~ All liabilities follow the asset. Individual income tax liabilities during the marriage are shared. Business hold harmless not dischargeable in bankruptcy.

(Strike through in original.) Trial exhibit 80. This is the clause the trial court was eventually called upon to interpret, when liability for some $2 million in federal income taxes due for 1990 surfaced as an issue.

As of July 5, 1990, the parties had received $550,000 in year-to-date distributions from Megaquest. The parties' 1989 business and individual tax returns had not yet been filed. Eisenberg did not yet know exactly what the taxable business income for 1990 would be, but the trial court

---

[1]Attached to the first page are schedules "A" and "B" consisting of properties and values to be distributed to each party. Item 2 on schedule "B", entitled "Property to Joel Eisenberg", reads: "Business ownership interest in partnership with Betsy with all liabilities". No value is shown for the businesses.

found that he knew that it would be millions in excess of the $550,000 theretofore distributed. In fact, Eisenberg received some $7 million in business income during 1990, most of it after the July PSA was signed. He used $2.5 million of this income to pay Sievers the $2.5 million for her equity in the new family home.

On July 6, 1990, the parties went to court to preserve their property settlement on the record. The court approved the settlement. The parties and the court fully expected that the formal contract would be prepared within days and that the marriage would be formally dis-solved at or shortly after the conclusion of the statutory 90-day waiting period (at the end of July 1990). Although the parties had not yet resolved their parenting and child support issues, they expected to accomplish this relatively quickly with the assistance of an arbitrator and a mental health professional.

After numerous delays, the formal property settlement agreement was finally ready for signature and was in fact signed on October 15, 1990 (hereinafter, the October PSA). The tax liability clause in that contract reads as follows:

> Commencing with the 1990 Federal Income Tax Return, the parties agree to file separate individual tax returns (Forms 1040) as required by law. The parties shall divide equally the tax liability for the dividend income of $550,000 received . . . from the businesses prior to July 5, 1990 and shall be liable equally or receive equally any liability or refund due on 1989 taxes and shall share equally any estimated tax payments *or tax withholding accounts* if any, made prior to July 5, 1990. *Other than the foregoing, neither party shall be libel [sic] for the individual income tax liabilities of the other party.*

(Italics added to reflect Eisenberg's handwritten addition to the clause, made on October 15 and thereafter approved by Sievers.) Trial exhibit 31.

Before the October PSA was placed in final form, Eisenberg asked his tax accountant to review it, asking the accountant in the course of an eight-page memorandum:

> Gary, [i]s this language strong enough so Rebecca is responsible for all personal federal income tax that was incurred as

a result of the profits of Sub S corporations she owned but which she may not have received dividends from and would that be (A) through the date of the separation or (B) through the date that the contract was signed or (C) until the stock is transferred.

. . . .

Please be sure to review this paragraph with Gary Muller and feel free to consult a tax lawyer if Gary feels it helpful. I hope the advice is that we can accept this as written so we don't have to discuss this, & draw their attention to a problem that they have not focused on.

Trial exhibit 117.

The stock in the Subchapter S corporations was transferred from Sievers to Eisenberg on October 15, 1990. In or about December 1990, Sievers became aware that Eisenberg contended that, under the provisions of the tax code and the property settlement agreement, Sievers would be individually liable for federal income taxes on several million dollars in business income received by him, but attributable to her because she held the stock in the Subchapter S corporations until October 15, 1990, when the formal contract was signed and the stock formally transferred.[2]

Sievers contended that the actual intent of the settlement was something far different: Because the 1989 federal income tax returns had not yet been prepared at the time of the July PSA and because the parties had received $550,000 in dividends before July 5, 1990, the words "individual tax liabilities during the marriage are shared" meant that she would pay one-half of any remain-

---

[2]According to expert testimony at the trial, Subchapter S corporation and partnership business income flows through to the business owner's individual income tax return. Moreover, where stock in a Subchapter S corporation is transferred, income for the year is prorated back on a per share per day rule. By Eisenberg's most extreme position at trial, Sievers would have been responsible to pay income taxes on $5.7 million in 1990 business income, which would result in a $1.6 million tax bill; Eisenberg would have been responsible to pay taxes on $1.6 million of business income, which would result in a tax bill of $430,000. This would be so, even though Eisenberg and not Sievers personally received more than $6.5 million from the businesses in 1990.

ing tax liability for 1989, and one-half of the taxes due for the $550,000 dividend received prior to the execution of the July PSA. Sievers also contended that the words "all liabilities follow the asset" meant that she would pay all of the taxes due on her individual earnings and on investment income from assets awarded to her. The same would be true for Eisenberg, who would receive and pay the taxes due on all Megaquest income distributed to him after July 5, 1990.

At trial, Sievers testified consistently with her pretrial and trial position that this is what she had intended at the time of the settlement. Eisenberg did not testify consistently with his pretrial and trial position. Although he testified on direct examination that he had given no thought to the tax consequences of the July PSA at the time he signed it, on cross-examination Eisenberg admitted that he went back to work after signing the July PSA with the belief that Megaquest belonged to him and with the understanding that the tax liability arising from income generated by Megaquest would be his responsibility:

> A. . . . my understanding is I got the businesses after July 5, and that's why I went back to work for the businesses, to make money that would be divided between Betsy and I.

> Q. You went back with the understanding that you were going back to work, you were going to make the money for Betsy and you, and you were going to pay the income tax on the money you made, right; that was the understanding?

> A. That the money that I made after the agreement, after things were separated, I would make the money, I would pay the tax. It makes sense to me.

Report of Proceedings, March 23, 1992, Clerk's Papers, at 2010-11. Eisenberg also admitted at trial that, in spite of his understanding of the settlement agreement, he altered the language in the October PSA in an effort to have a final agreement that would require Sievers to pay tax on flow-through income received by him but attributable to her by virtue of the Subchapter S shares held in

her name. Report of Proceedings, March 23, 1992, Clerk's Papers, at 1990.

The court ultimately found that when the parties settled their case on July 5, and sought court approval of the settlement on July 6, both intended that the tax liability for 1989 be shared equally, that the taxes due on the $550,000 dividend distributed before July 5, 1990, be shared equally and that Eisenberg would receive all the business income from and after July 5 and that he would assume, pay and hold Sievers harmless from all the tax liability on that income. The trial court then construed the October PSA to have the same legal effect as the July PSA, notwithstanding Eisenberg's efforts to the contrary. The court concluded that the July PSA effectively transferred the businesses to Eisenberg, even though formal transfer did not occur for several more months.

## Child Support

The parties had three children, ages 14, 12, and 8 at the time of trial. The parties agreed to resolve their child support issues by way of arbitration. An arbitrator was designated, who, in October 1990, awarded Sievers $2,000 per month per child for the support of the children. This award was confirmed by a judgment of the court in November 1990. Thereafter, Eisenberg successfully moved to have the judgment vacated and the award set aside, on grounds that one of Sievers' attorneys had a professional relationship with the arbitrator which had not been disclosed to Eisenberg. The child support issues proceeded to trial in November and December 1992.[3] The trial court then determined the child support obligation from October 1990 to the time of trial, and for the future.

During the arbitration, Eisenberg had represented to the arbitrator that he had gross income, including distributions from Megaquest, of $24,660 per month and

---

[3]The trial was bifurcated. The tax issues were heard in March 1992. The child support and attorney fee issues were heard in November and December 1992.

net income of $15,741 per month. It will be noted that a gross monthly income of $24,660 amounts to a gross annual income of $295,920. At the time of trial, Sievers was able to show that contemporaneously with this representation to the arbitrator, Eisenberg received distributions from Megaquest in the sum of $3.9 million—more than 10 times the amount reported to the arbitrator. By the end of 1990, Eisenberg's share of Megaquest income for the year exceeded $6.5 million—$5.4 million of which Eisenberg received after July 5, 1990.

By the time of trial in November and December 1992, Eisenberg had yet to prepare and file any tax returns for tax years 1990 and 1991. Eisenberg conceded that his 1990 income was as represented by Sievers, but testified that his net income had since been reduced to $7,300 per month, in that the 900 telephone businesses had collapsed in the United States and foreign countries, for reasons peculiar to each country. Eisenberg produced no records to substantiate his claims. The trial court specifically found Eisenberg not to be a credible witness regarding his businesses or income. "Thus, the record is essentially void of information about his income over the past two years". Finding of fact 47, Clerk's Papers, at 92.

The court observed that Eisenberg had disclosed real estate valued at $4.25 million and more than $2 million in stocks and bonds, exclusive of his interest in Megaquest and without taking into account any return on the tangible assets distributed to Eisenberg by the July PSA.

The court found that Sievers' net monthly income from investments at the time of the arbitration was $25,800. Since then, she had incurred substantial attorney fees and set up several trusts, so that her investment income had reduced to $14,000 per month. Because Sievers had several hundred thousand dollars which were not invested at market rates, the court imputed to her an additional $2,000 per month in investment income. Because she was a college graduate, in good health and employable, the court imputed wages to Sievers of $2,500 per month. Thus,

Sievers' income for child support purposes was found to be $18,500 as of the time of trial.

Sievers claimed monthly expenses of $14,000 per month for herself and the three children. The trial court noted that Sievers owned real estate valued at more than $1.1 million, liquid assets in excess of $1.9 million and more than $500,000 in other assets.

The court specifically found that, as of October 1990, the parents had a net monthly income of $384,700. The court also found that the children, who attended public school, participated in activities which reflected the kind of lifestyle they had enjoyed before their parents' separation.

In place of the vacated arbitrator's award, the trial court set child support at $3,000 per month per child from October 1990 to the time of trial. Eisenberg requested the trial court to treat the trial as a modification proceeding, in that two years had elapsed since the effective date of the current support award and he had suffered a substantial change of circumstances in the intervening two years. The trial court, mindful of its findings that Eisenberg lacked credibility as a witness and had produced no tax returns or other documentary evidence to substantiate his claims of recent poverty, ruled that Eisenberg had failed to show a substantial change of circumstances as required by RCW 26.09.170. Accordingly, the court ruled that the current child support would remain at $3,000 per month for two more years, before being subject to review.[4] In so ruling, the court noted: "[E]ven if Eisenberg's submissions are accepted at face value, he possesses substantial wealth in the form of real estate and other assets". Finding of fact 58, Clerk's Papers, at 94.

The trial court also imposed an obligation upon Eisenberg to obtain and maintain $650,000 in decreasing term

---

[4]By an amendment to the child support modification statutes which had become effective by the time of the trial, child support could be modified after one or more years without a showing of changed circumstances. *See* RCW 26.09.170(4).

life insurance payable into a trust to secure the present value of his child support obligations in the event of his untimely death. The support decree provides that if Eisenberg fails to provide or maintain this insurance, the children or their custodian shall have a claim against Eisenberg's estate for the deficiency. Clerks Papers, at 111. The court awarded the two older children's dependency exemptions to Sievers and the exemption for the youngest child to Eisenberg, on condition that he remains current in his child support obligations.

### Attorney Fees

Sievers sought an award of attorney fees at trial, based on intransigence by Eisenberg. In the memorandum decision responding to this request, the trial court noted:

> Considering the positions taken by husband in this litigation including husband's contention regarding the meaning of the settlement agreement, . . . the absence of basic data required by law such as a 1991 tax return and current income information, . . . the court concludes that an award of attorneys fees to wife is necessary.

Decision on Child Support, Clerk's Papers, at 78.

The court thereafter entered formal findings which are consistent with the oral ruling. Specifically, the court found that Sievers' counsel either did not know that the Megaquest businesses were Subchapter S corporations or partnerships or did not appreciate the tax ramifications of that fact.

> [Counsel's] lack of appreciation of the nature of the Megaquest businesses' tax status and the extent of the 1990 taxable income was apparent to Eisenberg's counsel, who made no effort to inform Sievers' counsel of the true facts or to phrase the parties' formal agreement in language that would clearly and accurately characterize the nature and extent of the income tax liabilities they sought to impose upon Sievers.

Finding of fact 34, Clerk's Papers, at 88.

As Eisenberg points out, Sievers retained (among oth-

ers) attorney George Newsham, who testified at trial that he had copies of Megaquest tax returns through 1988 which did reflect the Subchapter S and partnership status of the businesses. Newsham also testified that he fully understood the tax treatment of income from these business entities, but considered it essentially irrelevant to Sievers' interests after July 5, 1990, in that Eisenberg, who had represented that the businesses were doing very poorly, would be receiving all the Megaquest income and paying all of the taxes thereon by the terms of the July and October PSAs. Newsham said that he anticipated that Sievers would receive K-1 forms which would notify the IRS that Sievers had received income which Eisenberg had actually received, so that it would be necessary to explain to IRS when Sievers filed her 1990 tax return that by the terms of the property settlement agreement, Eisenberg would be reporting the business income and paying the necessary taxes on all but half of the $550,000 dividend the parties received prior to July 5, 1990. Newsham testified that he first became aware that Eisenberg and his counsel were taking a different view of the terms of the settlement in December 1990.

The trial court determined that Eisenberg was obligated by virtue of his fiduciary obligations and duties of fair dealing and good faith to disclose the nature and extent of the individual tax liabilities flowing from the tax code which he sought to impose upon Sievers. His failure to make the necessary disclosures and his failure to produce the records required by law with respect to the child support proceedings constituted intransigence which had sufficiently permeated the proceedings to justify an award to Sievers of half her attorney fees, $210,000.

## Cross-Appeal

Although the parties had not bargained for an equitable lien against property conveyed to Eisenberg to secure his tax and other financial obligations contained in the property settlement agreement, Sievers sought at trial an eq-

uitable lien upon Sievers' real property to secure Eisenberg's performance of his contractual and decretal tax obligations. The trial court denied this request, believing it beyond the authority of the court, in that the parties had not contracted for this relief and the court had determined to enforce the property settlement agreement.

Following entry of the decree of dissolution of marriage in February 1993, this timely appeal and cross-appeal were filed.

## DISCUSSION
### Challenge To Trial Court's Interpretation of Tax Liability Clause

■ Eisenberg argues first that the trial court ignored the principles set down in *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990) by interpreting the July PSA in accord with Sievers' subjective intent. In *Berg*, the Supreme Court rejected a line of Washington cases which had held that ambiguity in the meaning of contract language must exist before evidence of the surrounding circumstances is admissible—otherwise, the contract must be interpreted in accord with its plain meaning. *Berg*, 115 Wn.2d at 669. Parol evidence is thus admissible in Washington to show the situation of the parties and the circumstances under which a written instrument was executed, for the purpose of showing the intention of the parties, whether or not the language in the contract is ambiguous.

> "Such evidence, however, is admitted, not for the purpose of importing into a writing an intention not expressed therein, but with the view of elucidating the meaning of the words employed. Evidence of this character is admitted for the purpose of aiding in the interpretation of what is in the instrument, and not for the purpose of showing intention independent of the instrument. It is the duty of the court to declare the meaning of what is written, and not what was intended *to* be written."

*Berg*, 115 Wn.2d at 669 (quoting with approval *J. W. Seavy*

*Hop Corp. v. Pollock*, 20 Wn. 2d 337, 348-49, 147 P.2 310 (1944)).

We find no violation of the principles of *Berg* in the trial court's analysis. Both Sievers and Eisenberg testified that they left the July 5 negotiation session with exactly the same subjective understanding of the meaning of the language contained in the July PSA. It is not surprising, therefore, that the trial court interpreted the business liability and tax sharing language contained in the July PSA in accord with the interpretation placed on that language by *both* parties as of the date the language was written. In objective terms, the language in the July PSA is as susceptible to the meaning the parties themselves gave to that language as to any other. The words "during marriage" contained in the July 5 PSA conceivably could mean until a final decree of dissolution is entered, or before separation, or before the petition for dissolution of marriage was filed, or before the marriage became irretrievably broken and the will to union was lost, or before the July 5 PSA was signed, or before the October 15 PSA was signed. It was incumbent upon the trial court to consider all of the evidence in light of the conflicting theories presented at the time of trial, and to determine which of several possible meanings these parties intended when they signed the July PSA. The parties' testimonies revealed that they enjoyed a true meeting of the minds on July 5. The trial court's finding as to the intent of the parties is supported by substantial evidence and will not be disturbed in this appeal.

Next, Eisenberg argues that the trial court should have "reformed" the July PSA to reflect the parties' expectation that the divorce would become final at or shortly after the expiration of the 90-day waiting period. Eisenberg argues that such a reformation would result in the words "individual income tax liabilities during the marriage are shared" contained in the July PSA being construed (presumably in conjunction with the per share per day rule contained in the tax code) to require Sievers to pay taxes

on $1.42 million in business income for 1990 instead of merely paying taxes on half of the $550,000 dividend received before July 5. Eisenberg argues that this would be eminently fair to Sievers, in that she would owe only $580,000 in additional taxes, leaving her with a net property settlement worth $5 million. Eisenberg has gone to considerable effort in his opening and reply briefs to explain to this court why the trial court should have reformed the contract to place a different meaning on the language contained in the tax sharing clause than the parties actually intended. Eisenberg's logic nevertheless escapes us. Moreover, he cites no authority for his position that this is an appropriate case for reformation of the contract. Accordingly, we decline to consider the argument further.

We affirm the trial court's interpretation of the tax sharing language contained in the July PSA.[5]

### Challenge To The Trial Court's Child Support Award

■ Eisenberg challenges the trial court's award of $3,000 per month for ongoing support of the parties' minor children. He does not challenge that sum for the $2^1/_2$-year period between the arbitrator's subsequently vacated award and the time of trial, but only for the period after the trial pending any request for modification pursuant to RCW 26.09.170(4)(a) (An order of child support may be modified 1 year or more after it has been entered without showing a substantial change of circumstances if the order in practice works a severe economic hardship on either party or the child).

Eisenberg first argues that once the trial court vacated and replaced the arbitrator's award, the support order effectively had been in place for 2 years and so it was subject to modification without a showing of substantial change of circumstances. Thus, Eisenberg concludes, the trial court

---

[5]Both parties agree that the trial court correctly ruled that the language contained in the July PSA controls the issue of the parties' intent, notwithstanding Eisenberg's effort to express a different intent in the October PSA.

erred in rejecting his request for reduced future support on grounds that he had failed to show a substantial change in circumstances. This argument presupposes that Eisenberg showed that the order in practice worked a severe economic hardship on him. This he failed to do. Eisenberg failed to produce documentary evidence to substantiate his claim that his net income had reduced from some $350,000 per month in 1990 to $7,300 per month in 1992. Eisenberg himself was clearly not a credible witness as to his businesses and income, leaving the record devoid of evidence as to his income in 1991 and year-to-date 1992. The trial court did not err in refusing to reduce the future child support from the amount deemed to be appropriate for the period October 1990 to the date of trial in November-December 1992.

Next, Eisenberg argues that the child support order should be vacated because the trial court failed to fill out the child support worksheets. Sievers argues that, in the absence of credible evidence as to Eisenberg's income, any worksheets would have been worthless and the trial court's findings contain all the information the worksheets would have contained in any event.

Although we sympathize with Sievers' position, RCW 26.19.035(3) requires that worksheets be filed in every proceeding in which child support is determined. There are no exceptions.

The findings of fact contain all of the information required for the worksheets except for Eisenberg's income at the time of trial. Eisenberg cannot be heard to complain about that omission because he failed to provide the trial court with any credible information as to that income. The last credible information as to Eisenberg's income contained in the record is for the year 1990 when Eisenberg's net monthly income exceeded $350,000. In preparing the necessary worksheets, the trial court may choose that figure, or an average monthly figure based on Eisenberg's documented income for tax years 1988-89-90, or devise some other rational means of determining Eisen-

berg's net income at the time of trial based on the records available to the court as of the time of trial.

Because the record and the trial court's findings support the child support award, we decline to vacate the award. But we have no choice but to remand for preparation and entry of the child support worksheets which the statute requires be entered at the time of every support decree.[6]

We next deal with Eisenberg's contentions that the trial court failed to consider all of Sievers' financial resources in determining her income for purposes of child support. Eisenberg complains that the court imputed too little interest income to Sievers by virtue of funds she had which were not invested at market rates, failed to consider the funds generated by the children's trust which are available to Sievers for support of the children, and failed to make findings with respect to huge sums of money which Eisenberg alleges were paid from Sievers' checking accounts to "cash" or for which there were no canceled checks. Sievers has not responded directly to these allegations in her brief, pointing instead to the trial court's findings as to Eisenberg's lack of credibility as a witness and Eisenberg's failure to produce any documentary evidence whatsoever reflecting his own income.

We would be much more concerned about Eisenberg's contentions were it not for the fact that the parties' incomes place them far beyond the income limitations

---

[6]For such comfort as it may be to Sievers and the trial judge, we point out that the worksheets serve a salutary purpose even where the same information required on the worksheets can be gleaned from a careful reading of the findings of fact. Here, there are 78 findings of fact in all, and although only 16 of those findings are labeled as relating to child support, findings as to Eisenberg's 1990 taxable income are scattered throughout other sections of the findings. The parties' children were young enough at the time of trial to make it likely that child support modification actions may be brought in future years. Child support enforcement actions are not beyond the realm of possibility. Future courts and attorneys who may be called upon to deal with matters relating to the children's support will be grateful to find child support worksheets containing the information about parental income and assets at the time of trial contained in one convenient document in the court file. The office of support enforcement, the administrator for the courts and other entities collecting statistical data about child support awards in the State of Washington will be equally pleased.

contained in the presumptive economic table. *See* RCW 26.19.020.

RCW 26.19.020 provides that the economic table is advisory but not presumptive for combined monthly net incomes that exceed $5,000. When combined monthly net income exceeds $7,000 the trial court may set support at an advisory amount for combined monthly net incomes between $5,000 and $7,000 or, upon written findings of fact, the court may exceed the amount of support set for combined monthly amounts of $7,000. Here, the trial court elected the latter option.

Although we would prefer precision in these matters even when combined parental income greatly exceeds the economic schedule, we are content in this case to defer to the trial court's determination of Sievers' income for child support purposes, noting as we do that Eisenberg's complaints are greatly weakened by his failure to provide the information required by RCW 26.19.071 as to his own income. If the trial court failed to account for every dollar of Sievers' income (we do not so rule) the oversight pales in comparison to Eisenberg's failure to provide the court with the necessary information to determine his income by any more accurate means than an estimate based on what was available to him in 1990.

Next, Eisenberg points to two out-of-state cases for the proposition that $9,000 per month is simply too much money for child support, regardless of the amount of parental income. *See In re Marriage of Bush*, 191 Ill. App. 3d 249, 547 N.E.2d 590, 596-97 (1989) (a reasonable basis existed for awarding less than the guideline's amount where parents had more than enough income to provide for child and 20 percent of noncustodial parent's income greatly exceeded bounds of anything child could reasonably need or desire) and *In re Marriage of Scafuri*, 203 Ill. App. 3d 385, 561 N.E. 2d 402, 406-07 (1990) (abuse of discretion to award guideline amount of $10,000 per month where lifestyle to which children were accustomed could be adequately maintained on $6,000 per month).

Eisenberg argues that there is much "fat" in Sievers' budget and that the parties' children, who attend public school and shop for their clothing at K-Mart and for their shoes at Volume Shoes, are not in need of $9,000 per month from him for child support.

The record reflects that, prior to separation, Sievers ran the household on $20,000 per month. From that sum, she was able to accrue savings and loan money to her family, so that not all of the money was necessary for the support of the family. The trial court took into account the fact that the children attend public schools, but found that their activities at the time of trial were similar to those they enjoyed before the separation of their parents. The trial court also considered the assets held by each parent as reflective of the parents' lifestyles, in which the children are entitled to share during their dependencies. The trial court has considerable discretion when parental income greatly exceeds the economic table as it does in this case. We find no abuse of discretion in the amount of support awarded here, the out-of-state cases cited by Eisenberg notwithstanding.

Next, Eisenberg argues that the trial court erred by securing the child support with decreasing term life insurance. Eisenberg points to RCW 26.18.150, a statute which authorizes the court to require a bond or other security for the amount of child support or spousal maintenance due for a two-year period. Eisenberg argues that the trial court exceeded its authority by requiring security for his child support obligation for more than two years. We disagree. RCW 26.18.150 refers to support *enforcement* proceedings. Eisenberg also argues that life insurance is unnecessary in this case, because he is very wealthy. However, the trial court did not provide that Eisenberg's support obligation would survive his untimely death, except in the event that Eisenberg fails to obtain and maintain the life insurance. We find no abuse of discretion in the trial court's approach to securing the children's right to support from their father in the event of his untimely death.

Last, Eisenberg challenges the trial court's award of the two older children's dependency exemptions to Sievers, leaving for Eisenberg only the exemption for the youngest child, so long as he is current in his child support obligation. Eisenberg fails to explain why he believes this was an abuse of the trial court's discretion. Without argument or explanation, Eisenberg merely points to *In re Marriage of Rogliano*, 198 Ill. App. 3d 404, 555 N.E.2d 1114, 1121 (1990), apparently in the hope that this court will read the case and rule in his favor based on the reasoning of the Illinois appellate court.

We presume that Eisenberg has in mind that court's ruling that state courts should award the dependency exemption to that parent who provides the majority of the child's support. We believe that trial courts may appropriately consider other factors, such as whether the benefit of the exemption would be wasted or largely wasted on a parent whose income meets or exceeds the graduated phase-out provisions of the tax code, particularly if the other parent could benefit from the exemption. Here, Eisenberg failed to produce his tax returns for any year after 1989 so that the trial court would have had no way of determining the relative benefits to the parents of shifting the dependency exemptions. Under these circumstances, we find no abuse of discretion in the trial court's award of the dependency exemptions.

We affirm the trial court's rulings with respect to the challenged child support provisions, remanding only for the preparation and entry of the child support worksheets.[7]

## Attorney Fees

Eisenberg first argues that the trial court erred by placing the burden of proof of good faith and fair dealing in the contractual relationship upon him, rather than

---

[7]The income levels here greatly exceed the programming features of the computer software commonly marketed in this area. We note that the arbitrator was able to prepare child support worksheets the old-fashioned way.

upon Sievers, who challenged Eisenberg's good faith and fair dealing and argued that he breached the fiduciary relationship between husband and wife, which does not cease upon contemplation of divorce. *See Seals v. Seals*, 22 Wn. App. 652, 655, 590 P.2d 1301 (1979). The trial court did not err. *See* RCW 26.16.210 ("In every case, where any question arises as to the good faith of any transaction between husband and wife, whether a transaction between them directly or by intervention of third . . . persons, the burden of proof shall be upon the party asserting the good faith".)

■ Although the Supreme Court said in *Erfurth v. Erfurth*, 90 Wash. 521, 524, 156 P. 523 (1916) that this statute allows the good faith of a conveyance by deed between husband and wife to be questioned only by creditors as holders of existing equities, in *In re Madden's Estate*, 176 Wash. 51, 54-55, 28 P.2d 280 (1934) the court clarified itself, holding that *Erfurth* was not out of harmony with *Yeager v. Yeager*, 82 Wash. 271, 274, 144 P. 22 (1914) (independent of RCW 26.16.210, law is well settled that burden is on husband to show that a transfer made to him by wife for inadequate consideration was made freely and that the transaction was fair and just). *Cf. In re Marriage of Matson*, 107 Wn.2d 479, 484, 730 P. 2d 668 (1986) (citing RCW 26.16.210 by analogy for the proposition that the demise of the rule that the husband be the sole manager of the community estate did not result in the demise of the fiduciary duties of marriage; rather, the duties are gender neutral).

Next, Eisenberg challenges the trial court's finding that Sievers' counsel were not aware of the intricacies of the tax code as related to transfers of stock in a Subchapter S corporation between spouses in a marital dissolution proceeding and the effect of the per share per day rule on such transfers, and that Eisenberg took unfair advantage of his superior knowledge of these tax matters. Eisenberg points to attorney Newsham's testimony that he knew Sievers held the stock in the Subchapter S corporations

and that he was fully aware of the tax rules which would govern the preparation of K-1 forms for tax year 1990.

Although we are somewhat mystified by the trial court's finding that Sievers' attorneys did not understand the tax issues involved (as opposed to a finding that they believed the settlement to have resolved those issues and that the stock transfers could be reported in a manner that would satisfy the Internal Revenue Service, in view of the property settlement agreement), Eisenberg is not entitled to a reversal on grounds of insufficiency of the evidence of intransigence. By Eisenberg's own admissions at trial, he fully understood the intent of the settlement of the tax liability issues, and in fact shared in that intent as of July 5, 1990, but nevertheless developed and carried out a plan to insert language into the October PSA in a deliberate effort to impose *additional* tax liability on Sievers, without drawing her attention to his plan.

■ We hold that a party to a property settlement agreement owes a fiduciary obligation and a duty of good faith and fair dealing to attempt to draft formal contract language that will honor that agreement. Any deliberate effort to draft language intended to subvert the agreement is a breach of the fiduciary obligations of marriage and a blatant violation of the duties of good faith and fair dealing in the contractual relationship.[8] This behavior, together with Eisenberg's misrepresentations of his income to the arbitrator and his failure to provide the trial court with documentary evidence of his income during the trial of the child support issues, constitutes intransigence sufficient to justify the award of attorney fees here imposed.

---

[8]It has not been necessary for us to review the sufficiency of the evidence to support the trial court's finding that Eisenberg's attorney made no effort to advise Sievers' attorney of the true facts or to phrase the October PSA in language that would clearly and accurately characterize the nature of the actual settlement agreement, and we have not done so. To the extent that Eisenberg's attorney may have knowingly participated in Eisenberg's scheme to shift additional tax liability to Sievers without her knowledge and against the intent of the July PSA, the attorney (who does not represent Eisenberg in this appeal) exceeded the bounds of advocacy.

We reject Eisenberg's argument that any good faith settlement efforts he may have made prior to the trial of the tax issues cured his earlier intransigence. We also reject his argument that Sievers should have been required to segregate her attorney fees, separating the fees incurred by reason of Eisenberg's intransigence from those incurred by reason of other matters. Here, Eisenberg's bad acts permeated the entire proceeding from and after July 5, 1990, both as related to the tax issues and as related to child support. The trial court's award of 50 percent of Sievers' entire fee was a reasonable estimate in all the circumstances. We find no abuse of discretion.

Eisenberg's appeal amounts to little more than an effort to carry on with the same efforts which caused him to lose credibility with the trial court on matters relating to his businesses and income. Eisenberg has presented no principled arguments justifying a reversal. We award Sievers her reasonable attorney fees incurred defending against Eisenberg's appeal.

## Cross-Appeal

By February 1993, when the trial court entered findings of fact, conclusions of law and the decree dissolving the parties' marriage, Eisenberg had not yet filed his 1990 income tax return, although he had made an estimated tax payment of $1 million. The record reflects a probable tax liability for 1990 of approximately $2 million. The Internal Revenue Service is not a party to the property settlement agreement and could enforce Eisenberg's contractual and decretal tax obligations against Sievers, who held the stock in the Subchapter S corporations until October 15, 1990. Although the parties had not contracted for a lien against Eisenberg's real property to secure his tax obligations, Sievers sought an equitable lien at trial, based on Eisenberg's strenuous efforts to avoid his contractual obligations to pay the taxes due on the bulk of the 1990 business income. The trial court believed it was beyond its authority to impose the lien. We disagree.

Equity will create a lien where there is no valid lien at law and one is needed to prevent an injustice. *Northern Commercial Co. v. E. J. Hermann Co., Inc.*, 22 Wn. App. 963, 968 n.2, 593 P.2d 1332 (1979) (citing H. McClintock, *Handbook of the Principles of Equity* § 118 (2d ed. 1948)). Moreover, here the court approved the parties' property settlement agreement and ordered the parties to comply with its terms. Decree of Dissolution of Marriage, ¶ 5, Clerk's Papers, at 115-16.

In *Robinson v. Robinson*, 37 Wn.2d 511, 225 P.2d 411 (1950), the trial court approved the parties' property settlement agreement and incorporated it into the divorce decree. The agreement included a provision awarding to the husband all property not specifically awarded to the wife. Thereafter, under tax laws then extant, the bureau of internal revenue assessed a large additional separate income tax against the husband on income which had been reported as community income during the marriage and on which the marital community had paid taxes. This resulted in a refund of taxes which had been paid by the marital community. The Supreme Court determined that under the terms of the property settlement agreement the community refund belonged to the husband, *Robinson*, 37 Wn.2d at 515, and rejected the trial court's ruling that it did not have jurisdiction to enforce the property settlement agreement by ordering the wife to execute a tax release so that the husband could apply the refund to his separate tax debt. Once the court approved the parties' property settlement agreement, "it became more than the stipulation of the parties—it became the court's disposition of the property—and the reciprocal rights and obligations as set forth therein were definite, binding on the parties, and merged in the decree". (Citation omitted). *Robinson*, 37 Wn.2d at 517.

> It is our view that, when the parties to a pending divorce proceeding enter into a property settlement agreement which is made an exhibit in the case and in which it is stipulated that it may be made a part of the decree, and when the court

approves it and incorporates it into the decree the same as though specifically set forth therein, such an agreement and stipulation is sufficiently made a part of the decree to warrant its enforcement by one of the writs . . ..

*Robinson*, 37 Wn.2d at 518. Paragraph X of the October PSA provides that "[t]he Findings of Fact and Conclusions of Law and Decree of Dissolution to be entered, dissolving the marriage of the parties, will incorporate the rights and obligations of the parties as set forth in this agreement". Clerk's Papers, at 2241.

We hold that the trial court had the authority to enforce the tax liability clause by means of an equitable lien against real estate awarded to the husband. We remand so that the trial court may have the opportunity to exercise its discretion, to award a lien or not to award a lien, depending upon the relevant circumstances at the time of the remand hearing.

We reject Eisenberg's request that we direct a different trial judge to hear the case on remand. Eisenberg argues that the findings of the trial judge in this case "demonstrate a bias against Husband that will be difficult if not impossible for him to put aside on remand". Eisenberg's opening brief, at 43. To the contrary, the findings in this case contain straightforward assessments of the overwhelming evidence. The memorandum decisions are thorough, rational, dispassionate, judicially sound summaries of the trial court's unbiased view of the evidence and its application of the law. Conclusion of law 122 provides:

Subject to the Rules of Appellate Procedure, this court shall retain jurisdiction of any further proceedings relating to the dissolution of the marriage of the parties, the property settlement reached by them, child support and the Parenting Plan. This preassignment shall not mean that the parties have a right to more speedy access to this court than any other litigant.

Clerk's Papers, at 108.

In the interests of judicial economy, following a bifurcated trial which was held over a period of many months,

involving evidence of a highly technical nature, and producing an eminently fair result, we specifically affirm Conclusion of law 122.

Each party will bear his and her respective attorney fees incurred for the cross-appeal.

Affirmed as to Eisenberg's appeal, but remanded to the trial court for preparation and entry of child support worksheets. Reversed as to Sievers' cross-appeal, and remanded for exercise of the trial court's discretion whether to impose an equitable lien to secure Eisenberg's contractual and decretal tax obligations.

BAKER, C.J., and PEKELIS, J. Pro Tem., concur.