# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br><br>ROBERT P. McCLESKEY,<br><br>Respondent,<br><br>and.<br><br>KATHY A. McCLESKEY,<br><br>Appellant. | No. 77393-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br>FILED: November 26, 2018 |

CHUN, J. — Robert ("Bob") and Kathy McCleskey[1] entered into a separation contract as part of their marriage dissolution. Bob held significant stock from his employer. During negotiations leading to the contract, Bob claimed he could not immediately redeem his stock or accelerate the terms for redemption under the company's shareholder agreement. As a result, the separation contract entitled Kathy to half of any profit distributions from Bob's employer prior to his first stock redemption payment. But Bob redeemed his stock and ended the obligation to share profit distributions earlier than Kathy anticipated. Kathy filed a motion for contempt to enforce the separation contract for her share of a profit distribution, which the court denied. Kathy appeals, arguing the trial court erred by failing to hold Bob to the correct interpretation of

---

[1] For clarity, this opinion refers to the parties by first name. We mean no disrespect.

I.

## BACKGROUND

Kathy and Bob married in 1982. Bob filed for dissolution in May 2015. The parties settled out of court, signing a CR 2A agreement at mediation in April 2016. After a dispute arose about implementation of the CR 2A agreement, the parties participated in binding arbitration before the neutral who had served as the mediator. They signed a separation contract and finalized their dissolution on November 21, 2016. The final dissolution decree incorporated by reference the separation contract.

Bob served as Chairman of the Board and CEO of Sellen Construction Inc. (Sellen) and held 10,000 shares of the company's stock at the time of dissolution. The stock paid profit distributions once per year in December. The separation contract states, "Profit Distribution amounts are any distributions to holders of shares of capital stock of Sellen other than Tax Distributions, and are set each year by Sellen's Board of Directors, based on the company's business income and need for working capital." Redemption of the stock shares generally occurred on retirement from Sellen after age 60. The 2012 Sellen Shareholder Agreement included specific procedures for early redemption of stock. After age 55, a shareholder could request to redeem up to 50 percent of held stock. According to the terms of the Shareholder Agreement, redemption occurred only on January 1st and required six months' notice and approval of the Board.

The parties negotiated the separation contract with this stock redemption procedure in mind. Upon filing for dissolution, Bob provided Kathy a copy of the

Sellen Stockholder Agreement and advised her to share the information with her counsel. The parties discussed the Shareholder Agreement extensively throughout mediation. While discussing possible acceleration of the cash transfers during arbitration, Bob represented through counsel, "[T]he only way he will be able to afford to pay Kathy a cash transfer installment is if he has received payment from Sellen for the redemption of his stock, and he can't accelerate the redemption payments from Sellen."

The separation contract divided the parties' assets, including the Sellen stock. The contract specified Kathy would receive 50 percent of any Sellen profit distributions paid to Bob *prior to* the first payment for redemption of his Sellen stock. The parties also agreed to a "schedule" of installment payments from Bob to Kathy with the following terms:

> An equalizing non-taxable property transfer of $3,335,159 cash plus interest, to be paid by the husband to the wife in six installments as follows:
>
> a. $500,000 on or before April 29, 2016 (wife acknowledges receipt of this installment);
>
> b. $500,000 on the closing of the sale of the Rancho Mirage house awarded to the husband or June 1, 2017, whichever is earlier;
>
> c. $1,000,000 paid to the Trust (see below) within three business days of the husband's receipt of the first payment for the redemption (or other disposition) of his Sellen Construction Company Inc. ("Sellen") stock;
>
> d. $500,000 paid to the Trust (see below) within three business days of the husband's receipt of the second payment for the redemption (or other disposition) of his Sellen stock;

3

e. $500,000 paid to the Trust (see below) within three business days of the husband's receipt of the third payment for the redemption (or other disposition) of his Sellen stock; and

f. $335,159 paid to the Trust plus accrued interest (see below) within three business days of the husband's receipt of the fourth payment for the redemption (or other disposition) of his Sellen stock.

g. In the event that husband's Sellen stock is redeemed or otherwise disposed of in fewer than four payments, the balance of the $3,335,159 cash payment owed to wife plus accrued interest shall be due and paid to the Trust within three business days of the husband's receipt of the final redemption (or other disposition) payment for his Sellen stock.

*Prepayment.* The husband may pre-pay any or all of the foregoing installments without penalty.

*Interest.* Installments a., b., and c. of the non-taxable cash property transfer shall not bear interest. Installments d., e., and f. shall accrue simple interest at 2.25% per annum from the date of the husband's receipt of the first payment for the redemption (or other disposition) of his Sellen stock to the date such installment (d., e., or f.) is paid to the wife. Notwithstanding the foregoing, if installment b. or c. is not timely paid, such installment shall bear interest at 2.25% per annum until it is paid to the wife. The interest accrued on installments d., e., and f. shall be paid on or before the due date for installment f.

Kathy and Bob signed the separation contract in November 2016, effective April 27, 2016, and incorporated the terms into their final dissolution decree entered on November 21, 2016.

Eight days later, on November 29, 2016, the Sellen Board approved Bob's redemption of 500 shares of stock, effective December 1, 2016. Bob received the proceeds from the redemption on December 15, 2016, and transferred $1 million to Kathy as installment c. under the separation contract. Bob also

received a profit distribution from Sellen on December 22, 2016. He did not pay any portion of the profit distribution to Kathy.

By June 1, 2017, Bob had not sold the Rancho Mirage house or transferred the $500,000 of installment b. to Kathy, as required by the schedule of payments in the separation contract. Interest began accruing on the $500,000 as of June 1.

On June 14, 2017, Kathy filed a motion for contempt, asking the trial court to enforce the separation contract.[2] Specifically, she claimed the separation contract required payment of the installments in order, and Bob's $1 million payment represented prepayment of installment b. and half of installment c. She requested the court order Bob to pay 50 percent of the profit distribution from December 2016 in keeping with the terms of the contract.

After a hearing, a King County Superior Court commissioner denied the motion. The commissioner ruled Kathy did not have a right to the profit distribution because "it was paid after she received $1,000,000 upon the first redemption of the petitioner's Sellen stock" and "[t]here is no requirement in the Separation Contract that installment b. for $500,000 be paid before installment c." The commissioner ordered Kathy to pay Bob $5,000 in attorney fees.

Kathy moved for revision of the commissioner's order. She again argued Bob failed to comply with the terms of the separation contract. She also claimed

---

[2] Bob filed his own contempt motion regarding his access to family photographs and videos. His motion and resulting trial court decisions are not on appeal.

Bob breached his fiduciary obligation to carry out the terms of the agreement. The trial court conducted a hearing and denied the motion for revision. The trial court concluded the separation contract was clear and unambiguous on its face and declined to consider extrinsic evidence, including the Shareholder Agreement. The court explained, "The contract is clear. It may not have been what people thought. But this Court can't substitute or write in terms that aren't there or consider parol evidence or intent of parties that is directly in contravention of the signed contract." The language of the contract did not reflect a specific timeline for stock redemption and the trial court declined to read one into the terms. The court reasoned as follows:

> If the intention of the parties had been that the stock payouts wouldn't start until 2017, then they could have negotiated and contracted for that, but they didn't. And if that was a condition precedent that they were expecting or assuming or intending based on whatever reason, then it either should have been in there or the parties can seek civil relief in terms of seeking to find . . . bad faith and dissolve the contract.

Kathy appeals.

## II.
## ANALYSIS

### A. Interpretation of the Separation Contract

Kathy moved for contempt to enforce the separation contract as allowed by the terms of the agreement incorporated into the dissolution decree and RCW 26.09.070(6).[3] "A court in a dissolution proceeding has the authority to enforce its decree in a contempt proceeding." In re Marriage of Mathews, 70 Wn.

---

[3] "Terms of the contract set forth or incorporated by reference in the decree may be enforced by all remedies available for the enforcement of a judgment, including contempt, and are enforceable as contract terms." RCW 26.09.070(6).

App. 116, 126, 853 P.2d 462 (1993). Contempt of court is "disobedience of any lawful judgment, decree, order, or process of the court." RCW 7.21.010(1)(b). "In determining whether the facts support a finding of contempt, the court must strictly construe the order alleged to have been violated, and the facts must constitute a plain violation of the order." In re Marriage of Humphreys, 79 Wn. App. 596, 599, 903 P.2d 1012 (1995).

A contempt determination rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. Mathews, 70 Wn. App. at 126. A trial court abuses its discretion by exercising it on untenable grounds or for untenable reasons. In re Marriage of Eklund, 143 Wn. App. 207, 212, 177 P.3d 189 (2008).

Here, the parties incorporated the separation contract into the final dissolution decree. "When an agreement is incorporated into a dissolution decree, we must ascertain the parties' intent at the time of the agreement." In re Marriage of Smith, 158 Wn. App. 248, 255, 241 P.3d 449 (2010). The court attempts to determine the parties' intent "by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Subjective intent lacks relevance if intent can be determined from the actual words used. Hearst, 154 Wn.2d at 503-04. The court must examine the reasonable meaning of the words used, giving effect to their ordinary, usual, and popular meaning unless the entirety of the agreement

demonstrates a contrary intent. Hearst, 154 Wn.2d at 504. "Courts will not revise a clear and unambiguous agreement or contract for parties or impose obligations that the parties did not assume for themselves." Condon v. Condon, 177 Wn.2d 150, 163, 298 P.3d 86 (2013).

A trial court may examine extrinsic evidence "for the limited purpose of construing the otherwise clear and unambiguous language of a contract in order to determine the intent of the parties." Go2Net, Inc. v. C I Host, Inc., 115 Wn. App. 73, 84, 60 P.3d 1245 (2003). Extrinsic evidence relating to the context of the agreement may be examined to determine the meaning of specific words and terms used, but cannot show "intention independent of the instrument" or "vary, contradict or modify the written word." Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999). "[E]xtrinsic evidence of a party's subjective, unilateral, or undisclosed intent regarding the meaning of a contract's terms is inadmissible." RSD AAP, LLC v. Alyeska Ocean, Inc., 190 Wn. App. 305, 315, 358 P.3d 483 (2015).

The appellate court reviews the language of a separation contract in a dissolution decree de novo. Smith, 158 Wn. App. at 255.

Kathy claims the contract's use of the words "installment" and "schedule" connotes a series of events in succession and demonstrates the parties intended the payments to occur in a specific order. She does not contend Bob was in contempt for failing to pay installment b., but by prepaying installment c. to avoid

8

her entitlement to his profit distribution. Bob argues the terms "installment" and "schedule" do not establish a strict order of the payments.

The contract clearly specified Kathy's entitlement to 50 percent of the profit distributions prior to Bob's receipt of the first payment for stock redemption. Under the terms of the contract, Kathy's entitlement to a share of the profit distributions ended after Bob's first redemption of stock. For installment c., the contract did not include a date, deadline, or condition precedent other than Bob's first redemption of stock. To require payment of the installments in strict sequence would add terms to the agreement inconsistent with the existing language. See Condon, 177 Wn.2d at 163.

A strict sequence would also improperly contradict the prepayment clause allowing Bob to prepay "any or all" installments. See Hollis, 137 Wn.2d at 695-96. Regardless of the meaning of "installment" or "schedule," the separation contract includes a clear and unambiguous provision allowing Bob to prepay "any or all" of the installments without penalty. In this case, Bob chose to exercise his option to prepay installment c. Based on the plain language of the contract, he was within his rights to do so.

While Bob redeemed stock earlier than Kathy anticipated, her subjective intent is irrelevant in light of the language of the separation contract. See Hearst, 154 Wn.2d at 503-04. Reliance on extrinsic evidence related to the Shareholder Agreement would serve to modify the contract, rather than give effect to the

terms as written. This is an impermissible use of parol evidence. See Hollis, 137 Wn.2d at 695-96.

Because the separation contract allowed Bob to prepay any installment, his payment of installment c. before installment b. did not violate the terms of the agreement. When Bob redeemed the stock and paid the $1 million to satisfy installment c., he terminated Kathy's entitlement to a share of the profit distribution. Bob's actions did not contravene the separation contract. Therefore, the trial court did not abuse its discretion in denying Kathy's contempt motion.

B. Breach of Fiduciary Duty

Kathy argues Bob violated his fiduciary duties to her by misrepresenting his ability to accelerate redemption of his stock. The trial court determined the issue was not properly before it on the contempt motion, and Kathy would need to bring a separate civil action on any such claims. Kathy contends the trial court had authority to resolve all issues relating to enforcement of the contract and urges reversal of the denial of the contempt motion due to breach of fiduciary duty.[4] A contempt motion cannot provide Kathy with the relief she seeks.

Spouses owe each other the highest fiduciary duty. In re Marriage of Lutz, 74 Wn. App. 356, 369, 873 P.2d 566 (1994). This duty does not cease during dissolution. In re Marriage of Sanchez, 33 Wn. App. 215, 218, 654 P.2d 702 (1982).

---

[4] Bob contends Kathy failed to raise the issue of fiduciary duty below. The record shows Kathy's counsel raised the issue of fiduciary duty and good faith and fair dealing in argument for revision of the order on contempt.

> [A] party to a property settlement agreement owes a fiduciary obligation and a duty of good faith and fair dealing to attempt to draft formal contract language that will honor that agreement. Any deliberate effort to draft language intended to subvert the agreement is a breach of the fiduciary obligations of marriage and a blatant violation of the duties of good faith and fair dealing in the contractual relationship.

In re Marriage of Sievers, 78 Wn. App. 287, 311, 897 P.2d 388 (1995).

Kathy cites In re Marriage of Langham and Kolde, 153 Wn.2d 553, 106 P.3d 212 (2005), to support the trial court's authority to reach the issue of breach of Bob's fiduciary duty. In Langham, the wife moved for entry of judgment for conversion against her former husband after he exercised stock options awarded to her upon dissolution of their marriage. 153 Wn.2d at 556. The trial court heard and decided the case on the family law motion calendar. Langham, 153 Wn.2d at 560. The Washington State Supreme Court upheld this decision, noting "[t]he superior court unquestionably has authority to enforce property settlements. It further has the authority to use 'any suitable process or mode of proceeding' to settle disputes over which it has jurisdiction, provided no specific procedure is set forth by statute and the chosen procedure best conforms to the spirit of the law." Langham, 153 Wn.2d at 560 (citation omitted) (citing RCW 26.12.010; RCW 2.28.150). The trial court had jurisdiction over the subject matter and parties through the equitable action to enforce the dissolution decree and properly acted within its authority to enforce the property settlement. Langham, 153 Wn.2d at 560.

Similarly, in Newlon v. Alexander, 167 Wn. App. 195, 272 P.3d 903 (2012), Division Three concluded the trial court had jurisdiction over a post-

11

decree dispute involving the remains of the parties' child. The parties filed a motion requesting the court determine the disposition of their son's remains. Newlon, 167 Wn. App. at 198. The appellate court concluded, "[e]ven after a decree of dissolution, the superior court acting as family court has authority to resolve disputes between former spouses." Newlon, 167 Wn. App. at 203-04.

Kathy contends Langham and Newlon demonstrate the trial court's ability to reach any issue in equity as part of an action in equity to enforce the dissolution decree. However, the procedural postures of these cases differ from the case at hand. In Langham, the wife moved to enter judgment for conversion against the husband, and he admitted the facts relevant to the tort of conversion. 153 Wn.2d at 558, 560. Thus, the wife's motion specifically requested adjudication of the husband's tortious conduct and the question was squarely before the trial court. Similarly, in Newlon, the parties filed a motion requesting the trial court resolve their dispute. 167 Wn. App. at 198. The parties placed the specific issue before the court for resolution.

Here, Kathy filed a motion to hold Bob in contempt for failing to obey the court-ordered dissolution decree. As a motion for contempt, the only question before the court was whether Bob disobeyed the court's order. Resolution of this issue required the trial court to determine the meaning of the separation contract and Bob's compliance with that agreement. Bob's duty to Kathy and his conduct was not before the court on the limited motion. Therefore, the trial court properly

concluded Kathy needed to bring her claims of breach of fiduciary duty and good faith outside of the contempt motion.

C. Attorney Fees

Bob and Kathy both request attorney fees pursuant to RAP 18.1(a) and the provisions of the separation contract. The separation contract includes a provision for attorney's fees, "[i]n any proceeding brought to enforce this Contract, the prevailing party shall be awarded his or her reasonable attorney's fees and costs." Because Bob prevails on appeal, he is entitled to his reasonable attorney fees and costs.

Affirmed.

_Chun,␣ J._

WE CONCUR:

_Andrus, J._          _Becker, J._

13