# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of<br><br>LAURIE JEAN GUDNASON<br><br>Appellant,<br><br>and<br><br>HELGI GUDNASON,<br><br>Respondent. | No. 83845-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — Laurie Gudnason appeals a superior court order vacating a qualified domestic relations order (QDRO) which had divided her former spouse Helgi Gudnason's pension benefits in their dissolution. The superior court ruled the QDRO did not reflect the intent of the parties' separation contract and decree of dissolution, vacated it, and entered a new QDRO carrying out the parties' original intent. We affirm.

I

On February 15, 2007, Laurie[1] petitioned for dissolution of her marriage with Helgi. They had been married 24 years.

A

In 2008, the parties entered into a separation contract. The parties agreed they were "desirous of making a full and final settlement, separation, division and

---

[1] We use the parties' first names for clarity, meaning no disrespect.

disposition of their marital and property rights and obligations by means of this document." They agreed the contract embodied "in its entirety the agreements of the parties concerning the disposition of their property . . . and all other issues between them." They agreed no modification of the agreement shall be valid "unless in writing." They agreed "each spouse will execute any deeds, bills of sale, assignments, promissory notes, transfers or other instruments and documents necessary to complete and effectively carry out the terms of this agreement."

Concerning property division, the parties recited they had "acquired the property set forth in Exhibits A and B hereof." (Emphasis omitted.) The contract provided, "The property described in Exhibit A shall be the sole and separate property of the wife. The property set forth in Exhibit B shall be the sole and separate property of the husband." (Emphasis omitted.) The contract allocated the marital property to each spouse as their "sole and separate property, free from any right, claim, title or interest" of the other. The parties warranted to each other neither had "any right, title or interest in any property of any kind or description whatsoever, other than as set forth herein." Specific to retirement benefits, the contract provided, "Both parties warrant that they have *no vested or non-vested interest* in any pension plan, retirement plan, profit-sharing plan or any other employee benefit *other than those benefits as set forth herein*." (Emphasis added.)

The contract allocated to Helgi "[a]ll retirement rights" accrued to him through employment including his Puget Sound Electric Workers' (PSEW) "pension and retirement benefits" (the Plan), except for a portion of these benefits

2

allocated to Laurie. The allocation to Laurie was subject to a calculation approved in In re Marriage of Bulicek, 59 Wn. App. 630, 632, 639, 800 P.2d 394 (1990). The formula was as follows:

½ x (Total months of Service during marriage / Total months of accredited Service at retirement date) x Monthly Benefit at retirement based on electing a survivor annuity

The contract stated, "All" rights in the Plan were allocated to Helgi except those identified as allocated to Laurie, the entirety of Laurie's allocation was subject to the Bulicek formula, and the contract made no allocation not subject to the Bulicek formula. Exhibit B, allocating property to Helgi, included that "[t]he date of separation to be used is 2/15/07." Although exhibit A, allocating property to Laurie, omitted this specific date, exhibit A, like exhibit B, described the Bulicek formula by reference to the "[t]otal months of Service during marriage," and both parties signed the contract in its entirety.[2] The provision allocating a portion of Helgi's retirement benefits to Laurie concludes, "To be divided by QDRO to be drafted by husband's attorney no later than 30 days after entry of the Decree."

In the terminology of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 829, a "domestic relations order" is "any judgment, decree, or order that concerns 'the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant' and is 'made pursuant to a State domestic relations law (including a community property law).' " Boggs v. Boggs, 520 U.S. 833, 846, 117

---

[2] In addition, the 2011 QDRO that Laurie drafted used February 15, 2007, as the end date for her accrual of benefits under the Bulicek formula.

3

S. Ct. 1754, 138 L. Ed. 2d 45 (1997) (quoting 29 U.S.C. § 1056(d)(3)(B)(ii)). Such an order is "qualified" if it "meet[s] certain requirements" listed in the statute. Id. (citing 29 U.S.C. § 1056(d)(3)(C)-(E)). A state court order that is "qualified" is exempt from ERISA's provisions guarding against the alienation of benefits and "creates or recognizes an alternate payee's right to, or assigns to an alternate payee the right to, a portion of the benefits payable with respect to a participant under a plan." Id. at 846-47. In Boggs, the court emphasized the surviving spouse annuity and QDRO provisions strongly implied that other state-law community property claims are not consistent with ERISA, and for that reason and others held ERISA preempted a deceased spouse's Louisiana law testamentary bequest of her interest in a participant's plan benefits. Id. at 844, 848.

On April 25, 2008, the superior court entered a dissolution decree that incorporated the separation contract by reference. The decree awarded each spouse as their separate property the property set forth in the separation contract. Neither party appealed the decree.

B

On May 13, 2008, Helgi's attorney sent a proposed QDRO (2008 QDRO) to Laurie's attorney. The proposal made Laurie the "Alternate Payee," reiterated the Bulicek formula in section 4, and prescribed the method of payment shall be made in the form of a "Single Life Annuity based upon the lifetime of the Alternate Payee." The 2008 QDRO stated that if Helgi died before payments were initiated under the order, "the Alternate Payee shall be treated as the surviving spouse of

the Participant and shall be entitled to a percentage of the benefits accrued, *as specified in Section 4 of this Order*"—i.e., pursuant to the Bulicek formula. (Emphasis added.) On May 12, 2008, Robert A. Bohrer, an attorney representing the Plan, addressed a letter to Helgi's and Laurie's attorneys stating the 2008 QDRO "complies with statutory, regulatory and Plan requirements." The parties never signed the 2008 QDRO.

In 2011, Laurie's attorney sent Helgi's attorney a new draft QDRO (2011 QDRO). It stated it had been prepared by a new attorney now representing Laurie. In its opening paragraph, the 2011 QDRO stated,

> Helgi Gudnason has a property interest in the retirement plan identified in section four below. The court awarded a portion of that property interest to Laurie Gudnason in section 12 of exhibit A, which was attached to and incorporated by reference into section 3.2 of the DECREE OF DISSOLUTION in this proceeding. The award of that interest was a part of the overall division of the property of the parties. The court reserved jurisdiction to enter a domestic relations order to govern that property award. This document is the domestic relations order contemplated by the court.

It included the Bulicek formula in paragraph 6 along with other provisions similarly found in the 2008 QDRO. In addition, paragraph 9 stated, "The Participant shall elect to receive the Participant's accrued benefit in the following form: 50% Joint and Survivor Annuity with the Alternate Payee treated as the surviving spouse." Paragraph 10 provided that should Helgi die before Laurie and before his annuity starting date, the Bulicek formula would not be followed, and instead Laurie would be treated as Helgi's surviving spouse "for purposes of the preretirement survivor annuity provisions of the Plan." In that scenario, the Plan would pay Laurie the

5

preretirement survivor annuity payable on Helgi's accrued benefit in the Plan using the Plan's benefit formula in effect as of the date of Helgi's death. Paragraph 11 provided that should Helgi die before Laurie but after Helgi's annuity starting date, the Plan would pay the postretirement survivor annuity to Laurie.

On April 20, 2011, Bohrer addressed a letter (Bohrer letter) to Laurie's counsel—her new attorney and her original attorney. The letter was not addressed to Helgi's counsel. Bohrer stated he had reviewed the 2011 QDRO and when entered by the court, it would constitute a valid QDRO. Bohrer concluded the QDRO was capable of being administered, stating, "The instructions for allocation under Paragraph 6 [i.e., the Bulicek formula] *have been supplemented by further instructions* at Paragraph 9 wherein the Participant elects to obtain a future benefit by way of an election for 50% Joint and Survivor Annuity with the Alternate Payee named as the surviving spouse." (Emphasis added.)

Helgi testified he did not receive the Bohrer letter in 2011. A PSEW pension manager, Melinda Stokes, testified it was not part of her job to send correspondence like the Bohrer letter to plan participants, but that responsibility fell to the pension attorneys. In the superior court, Laurie conceded, "It is undisputed that the husband did not see the letter before 2020 when he went to the pension office."

Laurie signed the 2011 QDRO on May 29, 2011, and all parties and the court signed the 2011 QDRO by November 10, 2011.

6

C

On February 7, 2020, Helgi applied for retirement. Helgi met with Stokes, who informed him that the 2011 QDRO designated Laurie as his surviving spouse and his new spouse, Claudia Elsemore, whom he had married in 2016, could not be substituted. Stokes provided Helgi with a copy of the Bohrer letter. Stokes testified that on being informed of the information in PSEW's file, "[Helgi] stated that that was not what his divorce said, that—you know, that [Laurie] was only awarded a portion of the benefits earned during the marriage."

On April 20, 2020, Helgi's attorney contacted Laurie asking her to sign an amended QDRO. Helgi's attorney asserted Helgi had "agreed to grant you a Separate Interest in his pension wherein he would give you 50% of the pension earned during marriage." The Plan obtained information from a consulting actuary, who explained that under the 2011 QDRO, if Helgi died before Laurie she would receive a portion of benefits not based on the benefit earned during marriage, but "based on [Helgi's] *entire benefit*." (Emphasis added.) On December 11, 2020, through her original counsel, Laurie refused to agree to an amended QDRO, stating she "would like to *maintain the agreement reached at mediation*." (Emphasis added.) Laurie quoted the benefit allocation of the separation contract incorporating the Bulicek formula, and stated her position was "[t]he *exact form* of how the pension should be divided was *agreed upon and reflected in the Separation Contract*." (Emphasis added.) In support of this position, Laurie quoted the sections of the separation contract setting forth the Bulicek formula.

7

After the parties were unable to reach an agreement, Helgi moved to have the 2011 QDRO vacated under CR 60(b)(3) and CR 60(b)(11). In support of the motion, Helgi testified, "I had provided Laurie Gudnason, my ex-wife, with 50% of the benefit earned <u>during marriage</u> with an agreed separation date of February 15, 2007." Helgi asserted, "It was <u>never</u> agreed that Petitioner Laurie Gudnason would continue to receive my pension benefits for my years of work *after* our separation and [dissolution]." Helgi testified he signed the 2011 QDRO believing its incorporation of the <u>Bulicek</u> formula referred to the "accrued" benefit as meaning "based on total months of service during the marriage only." In his motion to vacate, Helgi argued paragraph 9 of the 2011 QDRO, as explained by the Bohrer letter, gave Laurie a benefit that was "very different from what was written and intended in the parties' Separation Contract." Helgi acknowledged that under the <u>Bulicek</u> formula agreed to in the separation contract, Laurie was still entitled to receive "a prorated share" of the joint and survivor annuity benefit.

In response, Laurie now argued there were "two income streams" at issue. She argued the "first" of these was the monthly benefit paid during Helgi's lifetime and was divided pursuant to the <u>Bulicek</u> formula. But she further argued there was a "second" income stream consisting of a survivor annuity and "the parties further agreed that the wife would receive the survivor annuity." Laurie presented calculations allocating the entirety of this "second" income stream to herself and explicitly dissociating from it the parties' agreement to use the <u>Bulicek</u> formula. Laurie argued the fundamental principle of contract law that "a party to a contract

8

which he has voluntarily signed will not be heard to declare that he did not read it or was ignorant of its contents." Wash. Fed. Sav. & Loan Ass'n v. Alsager, 165 Wn. App. 10, 14, 266 P.3d 905 (2011). She applied this principle *to the 2011 QDRO.* Laurie argued, "[T]he husband had ample opportunity to read and review *the* [2011] *QDRO* before signing it." (Emphasis added.) On whether the 2011 QDRO conformed to the separation contract, Laurie argued, "With all due respect, if [Helgi] believes the [2011] QDRO was 'incorrectly written' or doesn't conform to the Property Settlement Agreement that is an error he needs to address with his attorney."

Laurie's testimony was that the parties had agreed to give her the survivor benefit independent of the Bulicek formula *as part of the original separation contract.* Laurie testified,

> We attended mediation to settle our issues. We settled all of our issues and signed a CR 2A agreement. My husband's pension was a very important asset. We expressly negotiated that when he retired I would receive a monthly benefit based on the Bulicek formula and when he died I would receive the survivor annuity benefit. He is 11 years older than I am and I fully believed, then and now, that I will outlive him. Thus, the survivor benefit was important and he agreed to give it to me.
>
> *We both then signed* a Property Settlement Agreement that clearly stated I got the monthly benefit based on the Bulicek formula and when he died I would receive the survivor annuity benefit. The exact form of how the pension should be divided was agreed upon and reflected in the Separation Contract.

(Emphasis added.) Laurie's declaration then recited the sections of the separation contract incorporating the Bulicek formula. Laurie further testified the parties "*signed*" the 2011 QDRO giving her the survivor annuity, quoting paragraphs 6 and

9

9 from the 2011 QDRO. (Emphasis added.) Laurie did not explicitly argue the 2011 QDRO constituted an express written modification of the original separation contract.

The superior court granted Helgi's motion to vacate the 2011 QDRO, under both CR 60(b)(3) and 60(b)(11). The superior court indicated the 2011 QDRO, as interpreted by the Bohrer letter, afforded Laurie benefits "contrary to the marital parties' Separation Contract." The superior court entered a new QDRO (2022 QDRO) superseding the 2011 QDRO. The superior court denied Laurie's motion for reconsideration and motion for an evidentiary hearing. In denying reconsideration, the superior court explained,

> The QDRO does not reflect the intent of the parties as expressly provided in the separation agreement that contains the bargained for agreement of the parties. CR 60 balances the principles of equity and finality. Fireside Bank v. Askins, 195 W[n].2d 365, 375, 460 P.3d 157 (2020) [(]citing[] Griggs v. Averbeck Realty, Inc.[,] 92 Wn.2d 576, 581, 599 P.2d 1289 (1979)[)]. Fundamentally, a CR 60 proceeding is "[']equitable in its character, administered upon equitable principles, and extended upon equitable terms.[']"[] Id. at 375[ (quoting] Roth v. Nash, 19 W[n].2d 731, 738, 144 P.2d 271 (1943)[)]. This is consistent with a court's "[']inherent power to supervise the execution of judgments[']" that have prospective effect. Id. at 375[ (quoting] Pac. Sec. Cos. [v]. Tanglewood, Inc., 57 W[n. ]App. 817, 821, 790 P.2d 643 (1990)[)]. The drafter of the QDRO did not accurately reflect the agreed to terms of the separation contract by using language that the drafter, and solely the drafter, was aware that the plan interpreted differently than the terms of the separation contract. Contract law does not preclude a CR 60 motion to vacate a judgment. The order vacating the QDRO does not include any order provisions regarding the separation contract and only provides that a QDRO consistent with the parties' separation agreement be presented to the undersigned. The parties' separation agreement remains without any modification by the order vacating the QDRO.

The superior court found "no support in the record or separation agreement that the Bulicek valuation agreed to by the parties included the future earnings of a subsequent community." The superior court ruled such an award of future benefits was not awarded by "agreement of the parties" or "a determination by a trial court." Laurie appeals.

II

A trial court's decision to vacate a judgment is reviewed for an abuse of discretion. Luckett v. Boeing Co., 98 Wn. App. 307, 309, 989 P.2d 1144 (1999). A trial court abuses its discretion if its discretion is manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

A

The superior court concluded the 2011 QDRO did not reflect the parties' intent as established in the separation contract. Similarly, Helgi contends "the [2011] QDRO drafted by Laurie's attorney contravened [the separation contract], and the Bohrer Letter confirmed as much." We agree. Further, because the separation contract was incorporated by the court as its decree, the 2011 QDRO additionally contravened the court's decree. This is because the separation contract, and therefore the decree, unambiguously divide Helgi's PSEW benefits in the manner he urges.

We considered an inverse factual scenario in In re Marriage of Smith, 158 Wn. App. 248, 253, 241 P.3d 449 (2010). There, based on a stipulated decree,

11

the spouse of a participant in a pension plan was awarded "[o]ne-half (1/2) of any and all rights accrued by virtue of present, past or future employment of the husband including but not limited to pension, retirement, profit sharing, reserve vacation, sick leave, insurance coverage, social security benefits and the like *for the length of the marriage.*" Id. (emphasis added) (alteration in original). When the participant retired 10 years later, at the request of his former spouse, the court entered a domestic relations order dividing the participant's "monthly pension payment." Id. The order limited the former spouse to a half interest based on the fraction of the number of months of marriage divided by the number of months the participant worked—i.e., the Bulicek formula—and applied the formula to the participant's entire benefit at retirement. Id. The participant in Smith challenged the order, arguing his former spouse's share should have been reduced to account for time they lived in a noncommunity property state, benefits earned in lieu of Social Security, and salary increases after separation. Id. The participant asserted the decree's award of rights accrued by virtue of future employment was inconsistent with provisions limiting his spouse's proportional share "for the length of the marriage" and awarding him property acquired after separation. Id. at 257. As a result, the participant argued, the decree was ambiguous and amenable to extrinsic evidence he contended showed the order did not correctly divide his pension benefits. Id.

We started our analysis from the principle that "[a] property settlement agreement incorporated into a dissolution decree that was not appealed cannot be

later modified unless the court finds the existence of conditions that justify the reopening of a judgment." Id. at 256 (citing Byrne v. Ackerlund, 108 Wn.2d 445, 453, 739 P.2d 1138 (1987)). It was in recognition of this principle that the plan participant in Smith insisted he was not challenging the decree, but arguing only that the subsequent order misinterpreted the allegedly ambiguous decree. Id. Because a decree that was not appealed can be modified based on only conditions justifying the reopening of a judgment, in Smith we looked to the decree, rejected the plan participant's assertion that the decree was ambiguous, and rejected his challenge to the domestic relations order because it "properly interpreted the decree's award of retirement benefits . . . as well as Washington law." Id. at 258. In In re Marriage of Lee, 176 Wn. App. 678, 690, 310 P.3d 845 (2013), also, we affirmed a trial court's entry of a QDRO that followed the separation contract, rather than one party's later stated intent.

Laurie does not challenge the 2008 decree, and we apply the same principles as Lee. The separation contract was authorized by RCW 26.09.070. Lee, 176 Wn. App. at 689. We review the language of a dissolution decree de novo. Id. at 688. When an agreement is incorporated in a dissolution decree, the court must ascertain the parties' intent at the time of the agreement. Id. A separation contract incorporated by reference is "merged into the decree." In re Marriage of Yearout, 41 Wn. App. 897, 900, 707 P.2d 1367 (1985). "When a property settlement is approved by a [dissolution] decree, the rights of the parties rest upon the decree." Aetna Life Ins. Co. v. Wadsworth, 36 Wn. App. 365, 368,

13

675 P.2d 604, reversed on other grounds, 102 Wn.2d 652, 689 P.2d 46 (1984). "The provisions as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment." RCW 26.09.170(1); see also Millheisler v. Millheisler, 43 Wn.2d 282, 283, 288-89, 261 P.2d 69 (1953). We have applied preclusion principles when parties have sought to avoid provisions of a separation contract incorporated into a decree. Kelly-Hansen v. Kelly-Hansen, 87 Wn. App. 320, 334, 941 P.2d 1108 (1997).

"If the language is clear and unambiguous, the court must enforce the contract as written; it may not modify the contract or create ambiguity where none exists." Lehrer v. State, Dep't of Soc. & Health Servs., 101 Wn. App. 509, 515-16, 5 P.3d 722 (2000). If the decree were ambiguous, we would determine its meaning as a matter of law using general rules of construction applicable to statutes, contracts, and other writings. In re Marriage of Gimlett, 95 Wn.2d 699, 704-05, 629 P.2d 450 (1981). We would " 'consider the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of the respective interpretations advocated by the parties.' " Paradise Orchards Gen. P'ship v. Fearing, 122 Wn. App. 507, 516, 94 P.3d 372 (2004) (internal quotation marks omitted) (quoting Berg v. Hudesman, 115 Wn.2d 657, 667, 801 P.2d 222 (1990)). Extrinsic evidence could be considered "to help the fact finder interpret a contract term and determine the contracting parties' intent," but not "to show intention independent of the contract." Brogan & Anensen

14

LLC v. Lamphiear, 165 Wn.2d 773, 775-76, 202 P.3d 960 (2009). "[T]he subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." Id. at 776.

Laurie argues the separation contract was ambiguous because it did not specify how it would treat what Laurie on appeal calls the "second" income stream consisting of the survivor benefit.[3] But it did not need to. The separation contract gave Helgi as his separate property "[a]ll" retirement rights in the plan, except for that portion identified as going to Laurie. After allocating to Helgi "[a]ll" rights in the PSEW plan, the separation contract says "except that [Laurie] shall receive: The following retirement benefits from [the] plan." Laurie's allocation mirrors this language, indicating she receives as her own separate property "[t]he following retirement benefits from [the] plan." Each allocation identically sets out the Bulicek formula, and applies it embracingly to Helgi's "Monthly Benefit at retirement based upon electing a survivor annuity." Far from leaving open the question whether

---

[3] Laurie has taken three different, inconsistent positions on how and when she says she was allocated the entirety of the survivor benefit independent of the Bulicek formula. Before Helgi filed his CR 60 motion, Laurie argued that the separation contract directed the allocation of benefits as set forth in the then-governing 2011 QDRO, arguing she wished to "maintain the agreement reached at mediation" and that the separation contract specified the "exact form" of the benefits she should receive. Then, in response to Helgi's motion to vacate the 2011 QDRO, Laurie contradicted this by arguing in her motion papers, though not in her declaration, the parties "further" agreed she would receive the survivor benefits, treating the 2011 QDRO itself as the controlling contract, and tacitly conceding it altered the original separation contract when her only response to the evident disparity was to argue that issue lay between Helgi and his attorney. Finally, on appeal, Laurie contradicts both of those contentions, arguing for the first time that the separation contract was ambiguous, and the 2011 QDRO was a necessary clarification of the parties' intent. Laurie never analyzes the language of the separation contract, let alone point to anything in it that allocates to her any share of Helgi's PSEW pension other than pursuant to the Bulicek formula.

Laurie's allocation based on the Bulicek formula covered benefits payable in Helgi's lifetime and survivor benefits, the separation contract expressly references "a survivor annuity" in the formula.

The separation contract's language that this allocation was "[t]o be divided by QDRO," does not confound the allocation to Laurie governed exclusively by the Bulicek formula. Washington law recognizes the validity of the separation contract, but the state-law contract was not effective by itself under ERISA's anti-alienation provisions to effectuate its division of the PSEW benefit in the absence of an ERISA-compliant QDRO. See Boggs, 520 U.S. at 846-48. The most straightforward reading of the requirement that the retirement benefits were to be divided by QDRO is that the parties would use a compliant QDRO to effectuate the property division on which they had just agreed with binding effect under state law. Two other provisions of the separation contract support this reading directly. One, the parties agreed they *had no* retirement benefits "other than those benefits as set forth herein," an agreement directly contradicting Laurie's argument that there remained a property division to agree on in a further arrangement. And two, the parties agreed they would "each . . . execute any . . . instruments and documents necessary to complete and effectively carry out the terms of this agreement." This acknowledges the need for "instruments and documents" to carry out the parties' agreements and describes the operation of a QDRO in doing so. As in Smith, the decree's unambiguous disposition of Helgi's PSEW retirement benefits "cannot be

later modified" absent conditions justifying reopening a judgment. 158 Wn. App. at 256.

Other provisions of the separation contract contradict Laurie's argument that the parties intended to make a further distribution or leave any issues for further discussion. They agreed the separation contract was intended as a "full and final settlement." They agreed it embodied "in its entirety the agreements of the parties concerning the disposition of their property . . . and all other issues between them." The separation contract included mutual warranties that neither party had any property other than as set forth in the agreement. As further context, the allocation of pension benefits under Bulicek is established as a fair allocation. In re Marriage of Rockwell, 141 Wn. App. 235, 253-54, 170 P.3d 572 (2007). Laurie points to no similar body of case law backing an allocation granting her what the superior court viewed as a grant of future community assets. Laurie does not point to any extrinsic evidence other than her declaration indicating her own intent, but "a party's unilateral or subjective intent as to contract's meaning" is not relevant. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). The separation contract discloses an unambiguous intent to distribute the entirety of the marital property. That distribution granted to Helgi all rights in the PSEW plan, except for a portion granted to Laurie governed by the Bulicek formula.

Laurie alternately argues that the 2011 QDRO should be viewed as a new contract granting her rights in the PSEW pension. Even assuming the parties

17

could modify a property disposition ordered by the court in such manner, the circumstances still do not support this argument. The 2011 QDRO stated it was intended to govern "that property award" which the trial court had already made in the decree, and that it constituted the order "contemplated by the court." It incorporated the Bulicek formula to divide Helgi's "monthly benefit." The original separation contract applied that formula to Helgi's "Monthly Benefit at retirement based on electing a survivor annuity," whereas the 2011 QDRO separately provided Helgi "shall elect" to receive his "accrued benefit" in the "form" of a joint and survivor annuity "with the Alternate Payee treated as the surviving spouse." The 2011 QDRO was ambiguous in that it stated it was intended to carry out the intent of the decree, but the Plan's interpretation signaled a different result. Having the Bohrer letter, Laurie was aware of the discrepancy. As the superior court ruled, "The drafter of the [2011] QDRO [Laurie] did not accurately reflect the agreed to terms of the separation contract by using language that the drafter, and solely the drafter, was aware that the plan interpreted differently than the terms of the separation contract." This supports construing the ambiguity in the 2011 QDRO against Laurie as the drafter. Cronin v. Cent. Valley Sch. Dist., 23 Wn. App. 2d 714, 756, 520 P.3d 999 (2022).

The superior court based its ruling in part on an analysis of ERISA's protections for spousal rights, and the parties disagree on whether their respective QDROs violate that law. ERISA does not determine the parties' state law property disposition. It is undisputed any of the orders at issue—Helgi's proposed 2008

18

QDRO, the 2011 QDRO, and the 2022 QDRO—would have been acceptable to the Plan and, according to the Plan, could be implemented consistent with ERISA. The parties rely on Carmona v. Carmona, 603 F.3d 1041, 1057-59 (9th Cir. 2010), which held a state court could not, even through a QDRO, reassign a survivor annuity payment after the accrued benefit had vested and been reduced to an annuity following the participant's retirement and death. At the time of the superior court ruling under review, Helgi had neither retired nor died, and his accrued benefit had not been reduced to an annuity actuarially based on his, Laurie's, or Claudia's lifetime. Carmona is inapplicable. To the extent of the Plan's representations, ERISA would permit a property disposition in this case either according to the original separation contract and decree or according to the 2011 QDRO. The only question, therefore, is which of those dispositions is appropriately enforced as a matter of Washington law. We find no abuse of discretion in the superior court's ruling it was the former.

B

The court may relieve a party from a final judgment for "[a]ny other reason justifying relief from the operation of the judgment." CR 60(b)(11). This rule should be confined to situations involving extraordinary circumstances not covered by any other section of the rule. Gustafson v. Gustafson, 54 Wn. App. 66, 75, 772 P.2d 1031 (1989). For the first time on appeal, Laurie argues the superior court erred by relying on CR 60(b)(11) on the ground that if Helgi believed Laurie engaged in misconduct by failing to disclose the Bohrer letter, he needed to seek relief under

19

CR 60(b)(4). Because Laurie did not make this argument before the superior court, we decline to address this claimed error under RAP 2.4(a). Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005).

Helgi relies on the fact Laurie never provided a copy of the Bohrer letter to Helgi or his attorney. The superior court found, "It is extraordinary that neither [Bohrer] nor the [Plan] provided a copy of the 2011 letter to Helgi Gudnason. It is further extraordinary due to the fiduciary obligation and a duty of good faith and fair dealing owed under In re Marriage of Sievers, 78 Wn. App. 287, 311[, 897 P.2d 388] (1995)." In Sievers, we held a party to a property settlement agreement owes a fiduciary obligation and duty of good faith and fair dealing to attempt to draft formal contract language that will honor that agreement. Id. We further held any deliberate effort to draft language intended to subvert the agreement is a breach of the fiduciary obligations of marriage and a violation of the duties of good faith and fair dealing. Id.

"Spouses owe each other 'the highest fiduciary duties.' " In re Marriage of Lutz, 74 Wn. App. 356, 369, 873 P.2d 566 (1994) (quoting Peters v. Skalman, 27 Wn. App. 247, 251, 617 P.2d 448 (1980)). Spouses owe a duty to one another not only to enter into agreements in good faith but also to deal with each other fairly so that each may obtain the benefit of the other's performance. In re Marriage of Sanchez, 33 Wn. App. 215, 217-18, 654 P.2d 702 (1982). This duty does not cease during dissolution. Id. at 218. This court has previously expressed skepticism of negotiations unaccompanied by full disclosure of material facts in

20

dissolution, observing, "The trend has been toward requiring a duty to disclose in commercial transactions, even though there is an absence of a fiduciary relationship, *particularly if one of the parties has superior knowledge of business affairs*." Seals v. Seals, 22 Wn. App. 652, 655-56, 590 P.2d 1301 (1979) (emphasis added).

In Barr v. MacGugan, the court held an attorney suffering from severe clinical depression interfering with his ability to comply with a court order constituted an extraordinary circumstance under CR 60(b)(11). 119 Wn. App. 43, 45, 48, 78 P.3d 660 (2003). The plaintiff's attorney failed to respond to the defendant's discovery requests, and then failed to comply with an order compelling discovery responses. Id. at 45. The plaintiff had returned draft responses to discovery requests to her attorney and left multiple phone messages at his office, but she never received any response. Id. On the defendant's motion, the trial court dismissed the plaintiff's lawsuit with prejudice. Id. The plaintiff successfully moved to vacate the order of dismissal after learning her attorney had been suffering from severe clinical depression. Id. Barr upheld the vacatur, reasoning the irregularities that affected the trial court proceedings "were entirely outside the control of the plaintiff, the defendant, and the court." Id. at 48. Barr noted the plaintiff diligently provided information to her attorney and made follow-up inquiries, but through no fault of her own was unaware of her attorney's disability, and the defendant did not show with any specificity how he would be prejudiced by reinstatement. Id.

21

In <u>Topliff v. Chicago Insurance Company</u>, the court held the failure of process to be forwarded to the defendant constituted an extraordinary circumstance justifying relief to vacate a default judgment under CR 60(b)(11). 130 Wn. App. 301, 307, 122 P.3d 922 (2005). The plaintiffs properly served the defendant insurance company, but the insurance commissioner neglected to notify the defendant by forwarding process. <u>Id.</u> at 305. The insurance commissioner's failure deprived the defendant of the opportunity to respond to the lawsuit. <u>Id.</u> The trial court entered a default judgment for over $2 million, but later vacated the default judgment under CR 60(b)(11). <u>Id.</u> at 304. <u>Topliff</u> affirmed the order vacating the default judgment, reasoning the insurance commissioner's inexcusable neglect justified relief under CR 60(b)(11). <u>Id.</u> at 306.

<u>Sievers</u>, <u>Barr</u>, and <u>Topliff</u> share commonalities with this case. The opening paragraph of the 2011 QDRO recited that the court had already "awarded" an interest in the Plan to Laurie in its decree, the court reserved jurisdiction to enter an order governing "that property award," and "[t]his document" is the order "contemplated by the court." The 2011 QDRO went on to incorporate the <u>Bulicek</u> formula. Contrary to Laurie's arguments in this court, the 2011 QDRO stated on its face that it was intended to implement the award the court *had already made*, and as discussed above, the court had no authority apart from the power to reopen judgments to modify that award. We do not equate Laurie's conduct to the intentional concealment of marital property at issue in <u>Sievers</u>. But compared to Helgi, Laurie had "superior knowledge," <u>Seals</u>, 22 Wn. App. at 656, at the time of

22

the entry of the 2011 QDRO, and this procedural anomaly is a factor supporting a conclusion of extraordinary circumstances.

Helgi brought the error of the 2011 QDRO to the parties' and the court's attention before any benefits were paid from the Plan. The superior court's order, as in Barr, granted prospective relief only. And as in Topliff, the superior court reasonably found the failure of the pension attorneys to send their own plan participant the Bohrer letter supported extraordinary circumstances. Laurie argues that the Plan's neglect to send the letter to Helgi was not her fault. But that is not the inquiry. It remains a circumstance working a hardship on Helgi that was "entirely outside the control of the plaintiff, the defendant, and the court." Barr, 119 Wn. App. at 48. The superior court did not abuse its discretion in concluding this case presents a unique combination of extraordinary circumstances bringing it into the scope of CR 60(b)(11). Because we conclude relief was appropriate under that rule, we do not reach any other issues.

Affirmed.

_____
Birk, J.

WE CONCUR:

_____          _____
                                  Coburn, J.

23

No. 83845-8-I In the Matter of the Marriage of Gudnason

DÍAZ, J. (dissenting) — I agree with the majority that this matter is fundamentally an issue of contract interpretation, and that the Gudnasons' 2008 property settlement agreement (PSA) and the signed 2011 qualified domestic relations order (QDRO or DRO) are unambiguous. However, I respectfully disagree with their conclusion that the proper interpretation of those documents favors Helgi Gudnason.[1] The PSA was silent about who the survivor/payee of Helgi's death benefits was, and expressly deferred the final "division" of Helgi's pension benefits to a future instrument to be executed by the parties, which would "complete" the resolution of their dissolution. The DRO is that instrument, and it clearly states that Lauri should be treated as the surviving spouse of his death benefits. Our analysis should end there.

I further respectfully disagree with the majority's conclusion that Lauri's failure to forward to Helgi the qualifying "Bohrer" letter, which merely reiterated verbatim language from the DRO and was available to Helgi for years, constitutes exceptional circumstances under CR 60(b)(11).

Finally, I write separately because I am concerned that, under the majority's reasoning, any QDRO may be reopened and vacated simply because an unhappy litigant belatedly prevails on an alternate interpretation of a PSA and needs only to

---

[1] Because the parties share a last name, we will refer to them by their first names for clarity. No disrespect is intended.

point, even many years later, to a minor ministerial "anomaly" occurring in a heavily negotiated, unhurried, non-coercive resolution. Majority at 22.

For these reasons, I respectfully dissent.

I.     ANALYSIS

A. Supplemental Statement of the Standard of Review

We review a trial court's decision to vacate a judgement for abuse of discretion. Morin v. Burris, 160 Wn.2d 745, 753, 161 P.3d 956 (2007). A trial court abuses its discretion whenever it "bases its ruling on an erroneous view of the law." Gildon v. Simon Prop. Grp., Inc., 158 Wn.2d 483, 494, 145 P.3d 1196 (2006). The interpretation of contractual language used in a DRO or marriage dissolution decree is a question of law and therefore subject to *de novo* review. In re Marriage of Smith, 158 Wn. App. 248, 255-56, 241 P.3d 449 (2010).

B. Supplemental Statement of General Principles of Contract Interpretation

When parties dispute the meaning of an agreement incorporated by a dissolution decree, "the court must ascertain and effectuate their intent at the time they formed the agreement." Boisen v. Burgess, 87 Wn. App. 912, 920, 943 P.2d 682 (1997). "The intent of the parties is determined by examining their objective manifestations, including both the written agreement and the context within which it was executed." Id. We interpret contracts in a manner that will not render provisions of the contract meaningless. GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074 (2014).

When an instrument is "[c]lear and unambiguous" it will be enforced as written. Grey v. Leach, 158 Wn. App. 837, 850, 244 P.3d 970 (2010). "'A contract

2

provision is ambiguous when its terms are uncertain or when its terms are capable of being understood as having more than one meaning.'" Martinez v. Miller Indus., Inc., 94 Wn. App. 935, 944, 974 P.2d 1261 (1999) (quoting Mayer v. Pierce County Med. Bureau, 80 Wn. App. 416, 421, 909 P.2d 1323 (1995)). But, "ambiguity will not be read into a contract where it can reasonably be avoided." McGary v. Westlake Inv'rs, 99 Wn.2d 280, 285, 661 P.2d 971 (1983). When clauses appear to conflict, our aim is to harmonize them in order to give effect to all provisions in the contract. Nishikawa v. U.S. Eagle High, LLC, 138 Wn. App. 841, 849, 158 P.3d 1265 (2007).

As to further principles of interpreting a contract, we give words their "ordinary, usual, and popular meaning." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005). Where a contract contains conflicting general and specific provisions, "specific statements control over the more general provision[s]." Smith, 158 Wn. App. at 258.

When parties execute multiple instruments together, we construe them together. In re Estates of Wahl, 99 Wn.2d 828, 831, 664 P.2d 1250 (1983). "Generally, when two contracts are in conflict, the legal effect of a subsequent contract made by the same parties and covering the same subject matter, but containing inconsistent terms, 'is to rescind the earlier contract. It becomes a substitute therefor, and is the only agreement between the parties upon the subject.'" Higgins v. Stafford, 123 Wn.2d 160, 165-66, 866 P.2d 31 (1994) (quoting

3

Bader v. Moore Bldg. Co., 94 Wash. 221, 224, 162 P. 8 (1917)).

C. <u>Discussion</u>

1. The PSA and DRO can and should be read harmoniously

We start from the fundamental principle that "a party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents." <u>Nat'l Bank of Wash. v. Equity Inv'rs</u>, 81 Wn.2d 886, 912, 506 P.2d 20 (1973). Here, the parties signed both the PSA (which the court incorporated by reference into a dissolution decree) and the DRO.

The majority interprets the two documents such that the DRO contravenes or is otherwise inconsistent with the intent of the PSA and, on that basis, sets the DRO aside. Majority at 11. The majority has concluded that the DRO modifies the decree, which, under its reading of <u>Smith</u>, is not permitted. <u>Id.</u> at 12-13.

I would instead harmonize the two instruments by giving force to language in the PSA that anticipates work "to be" done by a future instrument to "complete" their agreement.

Specifically, the PSA expressly states that the pension was "[t]o be divided by QDRO." This prospective language, in the future tense, indicates that a further instrument, to be drafted in the future, would "divide" the pension. "Divide" ordinarily means "to separate into parts or portions and give out in shares." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 663 (2002); <u>In re Estate of Gillespie</u>, 12 Wn. App. 2d 154, 168, 456 P.3d 1210 (2020) (an undefined, nontechnical term may be determined from a standard English dictionary). Giving this provision its ordinary meaning, the PSA manifests the Gudnasons' intention to

4

defer the final "separation" or allocation of the pension to the DRO.

The PSA further indicates that the Gudnasons did not intend for it to serve as a complete and final memorialization of their agreement. The Gudnasons agreed in the PSA to "each . . . execute any . . . instruments and documents necessary *to complete and effectively carry out* the terms of this agreement." (Emphasis added.) "Complete" means "to make whole, entire, or perfect." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 465 (2002). On its face, the PSA thus acknowledges the fact that the parties had left some terms of their agreement incomplete, and obligated the Gudnasons to execute further instruments to complete it, i.e., the DRO.

Furthermore, section five in Exhibit B of the PSA begins with general language awarding "all retirement rights" to Helgi, "except that [Laurie] shall receive: The following retirement benefits from . . . [the] plan." The PSA then lays out a formula to calculate Helgi's "Monthly Benefit at retirement based upon electing a survivor annuity" and concludes with the "[t]o be divided" language. Id.; see also In re Marriage of Bulicek, 59 Wn. App. 630, 637, 800 P.2d 394 (1990) (establishing the formula as one of many fair divisions of pension benefits). And it is at this point that the majority and I diverge.

There is no survivor benefit formula identified and no survivor/payee identified either. Counsel for Helgi conceded as much. Wash. Ct. of Appeals oral argument, In re Marriage of Gudnason, No. 83845-8-I (Apr. 20, 2023), at 14 min., 22 sec., through 15 min., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023041261. In

other words, the division of the survivor benefit (both the formula and the recipient) in the 2011 DRO does not contradict the PSA because the PSA does not allocate any survivor benefit to any party or non-party. There is nothing to contradict.

Moreover, when parties execute multiple instruments together, we must construe them together. Wahl, 99 Wn.2d at 831. Here, when the parties filed their DRO with the court over 10 years ago, they referenced the dissolution decree and attached the incorporated PSA. This fact provides clear direction to this court to construe their intent by considering the entire package the trial court blessed. Only by interpreting the PSA as leaving the survivor benefit undefined (both the formula and the beneficiary) can this court "harmoniously" construe the PSA and DRO together and give full force to both instruments as executed by the parties. Nishikawa, 138 Wn. App. at 849.

In setting aside the 2011 QDRO, the majority posits an interpretation of the PSA that conflicts with various standard principles of contract interpretation.

First, the majority's interpretation relies on the general language in the PSA giving Helgi "'[a]ll' rights in the PSEW plan." Majority at 15. Similarly, the majority points to boilerplate language that the PSA was intended as a "'full and final settlement'" and "embodied 'in its entirety the agreements of the parties concerning the disposition of their property . . . and all other issues between them.'" Id. at 16. But following Smith, the specific provision dividing the pension benefits should control over this more general language. 158 Wn. App. at 258. Stated otherwise, the specific language of section five in Exhibit B of the PSA indicates that the parties' intent was to expressly dispose of the "monthly benefit" according to the

Bulicek formula, but then further "divide[]" the benefits from the PSEW plan through a forthcoming DRO.

In response, second, the majority argues that the "to be divided" language "does not confound the allocation to Laurie." Majority at 15. The majority interprets the term "divide" to mean "effectuate" their prior agreement and, in support, relies on the provision that commits the parties to "'execute any . . . instruments and documents necessary to *complete and* effectively carry out the terms of this agreement.'" Id. at 16 (emphasis added).

As a preliminary matter, the majority's interpretation emphasizes the term "effectively carry out" to the detriment of the phrase as a whole. That is, the majority's analysis does not allow for a non-redundant, independent meaning of the term "complete" in the phrase "complete and carry out." The plain language meaning of "complete" suggests that the PSA is incomplete or the parties left some terms open for future perfection. We should not render the term "complete" meaningless by conflating it with mere execution. GMAC, 179 Wn. App. at 135.

Further, I respectfully submit that the most "straightforward" reading of "to be divided" is not "to effectuate" or carry out anything because such an understanding attributes an unusual meaning to "divide," which ordinarily indicates a "separation" or allocation of some portion of some thing. Majority at 16. The majority's interpretation runs against the mandate to give words their ordinary and common meaning. Hearst Commc'ns, 154 Wn.2d at 504.

Third, the majority further faults Laurie for failing to provide extrinsic evidence supporting her interpretation of the PSA. Majority at 17. However, as

argued *supra*, the plain language of the PSA unambiguously deferred the final division of the pension to the DRO and its "intent can be determined from the actual words used." Brogan & Anensen LLC v. Lamphiear, 165 Wn.2d 773, 776, 202 P.3d 960 (2009). And thus, Laurie's "subjective intent . . . [was] generally irrelevant" and she had no obligation to provide extrinsic evidence.[2] Id.

In short, the manifest intention of the parties, when the PSA and DRO are construed together, was to divide the pension through a DRO and the DRO expressly names Laurie as the surviving spouse. Respectfully, the analysis should have ended there.

> 2. Failure to forward the Bohrer letter does not constitute exceptional circumstances under CR 60(b)(11)

Relief under CR 60(b)(11) "'should be confined to situations involving extraordinary circumstances not covered by any other section of the rule.'" In re Marriage of Yearout, 41 Wn. App. 897, 902, 707 P.2d 1367 (1985) (quoting State v. Keller, 32 Wn. App. 135, 140, 647 P.2d 35 (1982)). "Such circumstances must relate to irregularities extraneous to the action of the court or questions concerning

---

[2] Even if we were to examine extrinsic evidence, it is telling that Helgi's draft 2008 DRO (unsigned by the parties) would have allocated all potential disability payments to himself. CP 102 ("If the participant becomes disabled and begins receiving Disability Retirement payments from the Plan, such benefits are the separate property of the Plan Participant."). There is no reference to a disability payment in the PSA and yet, in 2008, Helgi appears to view this as an open issue to be revisited when they execute a DRO. Furthermore, in that 2008 draft DRO, Helgi claims the entirety of the disability benefit from his plan need not be subject to a Bulicek division, suggesting that the formula applied only to the monthly benefit, not to "all pension benefits" as the majority suggests. In short, like the disability benefit, the survivor benefit is a benefit contained within the pension, but is not expressly allocated to either party in the PSA, and is not covered by the Bulicek formula.

the regularity of the court's proceedings." Id. In other words, CR 60(b)(11) should be applied "sparingly," again, only to situations "'involving extraordinary circumstances not covered by any other section of the rules.'" In re Marriage of Knutson, 114 Wn. App. 866, 872-73, 60 P.3d 681 (2003) (internal quotation marks omitted) (quoting In re Marriage of Irwin, 64 Wn. App. 38, 63, 822 P.2d 797 (1992)).

In Knutson, this court found that a trial court abused its discretion when it granted a husband's motion to vacate under CR 60(b)(11), which allowed him to seek to modify a dissolution decree "dividing the marital assets in a manner [he claimed was] consistent with the intent of the parties as of the time of trial," although "[n]either party appealed the decree," and "[b]oth parties were unhurried in processing the QDRO while the . . . plan fluctuated in value." Id. at 873. In finding error, this court emphasized that the husband himself "did not appeal the decree, remained silent for more than a month after [his former wife] filed the QDRO, and took no action until more than three months after the trial court entered the decree." Id. at 873-74.

The trial court's order granting Helgi's motion to vacate under CR 60(b)(11) relied heavily on the fact that Laurie did not forward to Helgi the qualifying letter from the pension plan (the "Bohrer letter"), which only she received. The majority agrees and, pointing to a fiduciary obligation and duty of good faith and fair dealing owed by Laurie to Helgi, holds that "Laurie had 'superior knowledge' . . . at the time of the entry of the 2011 QDRO, and this procedural *anomaly* is a factor supporting a conclusion of extraordinary circumstances." Majority at 19-22 (quoting Seals v. Seals, 22 Wn. App. 652, 656, 590 P.2d 1301 (1979)) (emphasis

9

added). I respectfully disagree.

First, Laurie did not have "superior knowledge" simply based upon possession of the 2011 version of the Bohrer letter. In Seals, one spouse fraudulently failed to disclose the utter existence of substantial community property in a dissolution action, and affirmatively asserted that property's "nonexistence" in response to discovery. 22 Wn. App. at 654, 656.

Here, Helgi was not ignorant of the underlying property interest at issue or the nature of this document. Indeed, as his counsel acknowledged at oral argument, he knew what a qualifying letter was years before the Bohrer letter and, in fact, his counsel had a role in soliciting an earlier version of it. Gudnason, Wash. Ct. of Appeals oral argument, supra, at 8 min., 20 sec., through 8 min., 53 sec. Specifically, after the parties signed the PSA, as required, Helgi's counsel drafted a DRO and submitted it for approval to his pension administrators, who in turn sent him a qualifying letter. The parties never signed this draft DRO, but it shows that Helgi was aware of the concept of a qualifying letter, what its contents generally were, when one would be issued, and the procedures for obtaining one.

Moreover, as his counsel also acknowledged at oral argument, Helgi had access to the 2011 Bohrer letter for over 8 years before bringing this action. Gudnason, Wash. Ct. of Appeals oral argument, supra, at 10 min., 43 sec. through 10 min., 50 sec. At any time, he could have requested a copy from the pension administrator at his work place. Id. And there is nothing in the record to suggest that, other than her receipt of the letter in 2011, Laurie had any greater access than he did to the plan or other business records at any point. These facts stand

10

in great contrast to <u>Seals</u>, where the husband did have superior access to the business records and then actively concealed the community property. 22 Wn. App. at 656.

More substantively, the Bohrer letter told Helgi nothing more than was contained in the DRO, which he himself signed. The purpose of a qualifying letter is to inform the parties whether or not the DRO they signed is capable of being administered (or "qualified"), subject to constraints imposed by federal law. 29 U.S.C. § 1056(3)(A) & (C)-(D) (listing ministerial requirements to meet qualification); <u>Metropolitan Life Ins. Co. v. Wheaton</u>, 42 F.3d 1080, 1084 (7th Cir. 1994) ("The purpose [of a DRO and qualifying letter] is to reduce the expense of ERISA plans by sparing plan administrators the grief they experience when because of uncertainty concerning the identity of the beneficiary they pay the wrong person, or arguably the wrong person, and are sued by a rival claimant.").

Comparing the language of the letter and the 2011 QDRO, the Bohrer letter does not purport to do more than this ministerial action. The letter states:

> The Order is capable of being administered. The instructions for allocation under Paragraph 6 have been supplemented by further instructions at Paragraph 9 *wherein the Participant elects to obtain a future benefit by way of an election for 50% Joint and Survivor Annuity with the Alternate Payee [Laurie] named as the surviving spouse.*

(Emphasis added.) For comparison, the letter quotes nearly word-for-word the language in section 9 of the 2011 DRO:

> The Participant shall elect to receive the Participant's accrued benefit in the following form: 50% Joint and Survivor Annuity with the Alternate Payee [Laurie] treated as the surviving spouse.

Helgi contends that, without the Bohrer letter, section 9 can "be interpreted either

way." Gudnason, Wash. Ct. of Appeals oral argument, supra, at 11 min., 36 sec., through 12 min., 5 sec. This assertion flies in the face of the plain language of the DRO, which the letter quoted verbatim.

In short, I would not conclude, as does the majority, that Laurie had "superior knowledge" by virtue of possessing the Bohrer letter because Helgi had the same information, as he (presumably) read and signed the DRO itself.

Other factors also weigh against finding "extraordinary circumstances" here. Helgi does not allege that he signed the DRO under coercion or was hurried in any way. As in Knutson, Helgi considered the DRO for four months—a document which was merely six pages long—was represented by counsel, and freely signed it. 114 Wn. App. at 873. Also, as in Knutson, Helgi did not appeal the entry of the QDRO, "remained silent" and "took no action" for nearly a decade before bringing the present action. Id. at 873-74.

At the end of the day, this case is most similar to In re Marriage of Tang, 57 Wn.App. 648, 789 P.2d 118 (1990). There, a wife sought to have a dissolution decree vacated because the decree "failed to list, characterize, and evaluate" certain items of property, and because it "left the parties as tenants in common of most of their property." Id. at 649-50. The trial court granted the request and, on appeal, the wife argued, inter alia, that the trial court's order should be upheld under CR 60(b)(11). Id. at 650-51 & 655. This court reversed and reinstated the decree, holding that relief under CR 60(b)(11) "has previously been invoked in unusual situations which *typically* involve reliance on mistaken *information*" Id. at 656 (emphasis added). This court concluded that an incomplete enumeration of

the property that is later unpalatable to one side does "not justify relief under CR 60(b)(11)." Id.

The facts here present a similar situation. Taking him at face value, Helgi simply may have relied on a mistaken *belief*, namely, that he was signing the same or a similar DRO as in 2008, believing the 2011 DRO incorporated his understanding of the breadth of the Bulicek formula set out in 2008. As in Tang, I respectfully submit that a subjective misunderstanding about the words on the page that you sign, followed by regret at the result, are not "'extraordinary'" circumstances and do not justify relief under CR 60(b)(11). 57 Wn. App. at 655 (internal quotation marks omitted) (quoting Yearout, 41 Wn. App. at 902)).

Finally, even the majority does not equate Laurie's conduct to the intentional concealment of marital property, and it implicitly acknowledges that it was the pension plan's responsibility to send the Bohrer letter to Helgi's counsel. Majority at 22. Despite all this, the majority holds that it was an "anomaly" that Laurie happened to have the qualifying letter, and that that anomaly met the demanding vacatur standards of CR 60(b)(11). Id. I respectfully submit that a ministerial "anomaly" does not rise to the level of "an irregularit[y] extraneous to the action of the court [or an irregularity in] the court's proceeding," and the trial court abused its discretion in finding so. Yearout, 41 Wn. App. at 902.[3]

---

[3] The majority also cites to Barr v. MacGugan, 119 Wn. App. 43, 45-48, 78 P.3d 660 (2003), where a plaintiff was effectively deprived counsel because her attorney suffered from "severe clinical depression" and failed to respond to discovery requests, and Topliff v. Chicago Ins. Co., 130 Wn. App. 301, 304-06, 122 P.3d 922 (2005), where a defendant received a default judgment for $2,186,863.10 after they were deprived "the basic pillars of due process" because his counsel failed to forward service. Majority at 20-21. I would not conclude, as does the majority,

## II.    CONCLUSION

For the foregoing reasons, I respectfully dissent from the majority opinion.

Díaz, J.

---

that the facts of the present case approach the exceptional circumstances of either case.  In both of these cases, the party seeking relief under CR 60(b)(11) suffered a fundamental procedural defect in the prior judicial proceeding: the right to assistance of counsel in <u>Barr</u> and the right to notice in <u>Topliff</u>.  Those cases presented circumstances beyond the parties' control and created "irregularities in the proceedings," as required by CR 60(b)(11). <u>Yearout</u>, 41 Wn. App. at 902.  For the reasons above, no such irregularities occurred here.